## DORSEY, Etc. *v.* GENERAL ELEVATOR COMPANY, INC.

[No. 90, September Term, 1965.]

*Decided January 4, 1966.*

The cause was argued before HAMMOND, HORNEY, OPPEN-HEIMER, BARNES and McWILLIAMS, JJ.

· *Robert S. Rody,* with whom was *Bernard Brager* on the brief, for appellant.

·*David M. Buffington,* with whom was *Rignal W. Baldwin* on the brief, for appellee.

OPPENHEIMER, J., delivered the opinion of the Court.

The plaintiff, Alfred Henson Dorsey (Dorsey), a nightcleaner employed by the Emerson Hotel (the Emerson), brought an action of tort against the General Elevator Company, Inc. (General Elevator) in the Court of Common Pleas of Baltimore City for damages sustained when Dorsey fell down one of the Emerson's elevator shafts. Dorsey had filed a claim against the Emerson for workmen's compensation benefits and received payments from its insurance carrier which was joined as a use plaintiff in the action below. General Elevator filed a general issue plea and, at the close of the plaintiff's case, filed a motion for a directed verdict which the court below granted. Dorsey filed a motion for a new trial which was denied. On this appeal, Dorsey contends that there was sufficient evidence of negligence on General Elevator's part for the submission of the case to the jury.

In considering whether or not a directed verdict should have been granted, we examine all of the evidence in the light most favorable to the plaintiff and give the plaintiff the benefit of all plausible inferences. *Grue v. Collins,* 237 Md. 150, 153, 205 A. 2d 260 (1964) ; *Langville v. Glen Burnie Coach Lines, Inc.,* 233 Md. 181, 183, 195 A. 2d 717 (1963).

The accident occurred about midnight on August 31, 1961. The Emerson has four manually operated elevators which require operators inside the elevator cars in order for them to move from floor to floor. Each of the cars has metal gates, and all of the floors have shaftway doors which must be closed in order for the cars to operate. Number 3 elevator, which is located in the shaft where Dorsey fell, is designated for use by the cleaning personnel, and it is also used for maintenance and room service.

On the night of the accident, Dorsey reported for work at about 11 :00 p.m. Using the number 3 elevator which he entered at the kitchen level, he went to the seventeenth floor in order to change his clothes. He testified that he was alone and that he operated the elevator himself as he had been instructed to do. When he arrived at the seventeenth floor, he left a butt container or flower pot between the hatchway doors to prevent them from completely closing. After changing his clothes, he

re-entered the elevator and went to the second floor. Again he left the elevator doors partially open. After doing some cleaning, he returned to number 3 elevator and moved it to the first or lobby floor. Here he left the elevator hatchway doors, which were of the center parting variety, open just enough so that he could put his fingers between them to pull them back to re-enter. After drinking a cup of coffee, he returned to elevator number 3 with the intent of going to an upper floor to obtain a vacuum cleaner. The elevator hatchway doors were closed in the way he had left them. He put his fingers between them and pulled them back. When the doors went back, he heard someone call his name. He hesitated for a second, started to enter the elevator and fell to the bottom of the shaft, a distance of about forty or forty-five feet. On cross-examination, he testified that he learned later that someone else had taken the elevator.

Howard LeCompte, Chief Engineer of the Emerson, testified that both the hatchway doors and the elevator cars' metal gates had to be closed in order for the elevators to move. If the elevators were not working properly, he stated that he would call General Elevator for repairs or maintenance.

Dorsey also called as a witness Ernest Siegel, a consulting engineer, who inspected the elevator more than three years after the accident. He described the mechanical procedure in operating the elevator in question and stated that "if everything is operating properly, the elevator should not move when either door is open." He explained the mechanics of the spring-loaded closing device, the door locks, and the electrical contacts which must be closed in order for the elevator to be moved. He stated that it would be possible to open a shaftway door without the proper tool if there was a defect in the locking mechanism, but he could only "speculate" as to the nature of the defect or what part of the mechanism would have to be defective.

At the time of the accident, there was in existence a "full maintenance contract" between General Elevator and the Emerson which Dorsey introduced in evidence. Under this contract, General Elevator agreed regularly and systematically to examine, adjust, lubricate and repair or replace machine, motor, generator and controller parts of the Emerson's elevators. This

contract, however, expressly provided that General Elevator assumed no responsibility for certain items of elevator equipment, including hatchway enclosures, enclosure doors and interlocks and that the items listed were not included in the contract.

Dorsey also introduced in evidence an invoice dated August 25, 1961 for repairs done by General Elevator. The invoice was for services rendered on July 28, 1961 and contains the following notation at the bottom: "Re: Emerson Hotel, #3 Service Elevator. Check and secure all hatch door contacts as per Insurance Inspectors' report." The bill was rendered for services performed by General Elevator apart from its maintenance contract. As the invoice showed, the work therein referred to was performed over a month before the accident. No evidence was offered by Dorsey as to what floors in the Emerson were specified in the Insurance Inspectors' report; the Insurance Inspector who prepared the report was not called, nor was the report itself offered in evidence.

Dorsey contends that the August 25th invoice of General Elevator showing the work done by it on the elevator and the opening of the hatchway door involved in the accident which should not have been possible if the machinery had been properly functioning, with the other evidence as to a defect in the spring closing device, together sufficiently establish a *prima facie* case of negligence against General Elevator. We do not agree.

After Judge Carter had granted the motion of General Elevator for a directed verdict, he explained to the jury why he had done so, saying in part:

> "* * * I have an obligation at this state of the proceedings of determining whether or not there is legally sufficient evidence to require the defendant to go forward with his proof. Now what do we have here? First of all, the plaintiff alleges and has introduced into evidence a contract between the General Elevator Company and the hotel for the maintenance, supervision, so forth, of the elevators. That contract specifically excludes the hatchway doors * * * Now, the only other piece of evidence that has been offered

in my judgment and upon which the plaintiff seems to rely, is this receipted bill dated August 25th, 1961, Plaintiff's Exhibit No. 5, for some work that was done on the elevator, on some elevators. I don't know whether it was on this elevator, but whether or not it was at the—the work was done at the lobby floor or some other floor, I don't know. There has been no testimony or evidence one way or the other with respect to that, but in any event this work that was done on this elevator was outside of the contract for which there was a specific charge made by the General Elevator Company. Now, what is the notation on that bill? It reads, 'Re: Emerson Hotel, #3 Service Elevator. Check and secure all hatch door contacts as per Insurance Inspectors' report.'

"I don't know just what that means. It could mean the door or the contact on the hatch door at the lobby; it could mean on the first floor; it could mean on any of the seventeen floors. It can mean all; it could mean a few. I don't know. That's not before us. But it seems to me that before the plaintiff can use that as a basis for his allegation of negligence he would have to show that this particular door and contact on the lobby where this occurrence occurred was one that was involved, was covered by the Insurance Inspector's report. We don't know that. But there again, that was done on July 28th; this accident happened on August 31st. Again, there is no evidence that would suggest that there was a condition that existed on August 31st, that should have been repaired or that there was any that the hotel had any information concerning it, or more particularly, that General Elevator Company knew or had been requested within a reasonable time to make any such repair. So that as I see it, there simply isn't any evidence of any negligence that can be attributed to the General Elevator Company in this case."

As Judge Carter pointed out, the maintenance contract between General Elevator and the Emerson expressly excluded

the hatchway doors. The only evidence that General Elevator did any work on the hatchway doors was its invoice of August 25, 1961. This work was done over a month before the accident. There was no showing by Dorsey as to whether the hatch door contacts on the floor from which Dorsey fell were included in the repairs called for in the Insurance Inspector's report, in accordance with which, as the invoice states, the work shown therein was to be performed. It is entirely consistent with the evidence that any defect in the machinery may have taken place after the work which General Elevator did on July 28th. Unlike General Elevator's obligation to maintain certain machine and motor parts under its maintenance contract, from which the hatchway enclosures were excluded, the invoice of August 25th, under the most liberal construction of what was to be done thereunder, does not include any agreement of maintenance with respect thereto. There was no evidence that General Elevator had undertaken to repair the particular hatchway doors or that anything it did was a proximate cause of the accident. Dorsey's hypothesis rests on surmise and conjecture, which are not enough to warrant a submission of the case to the jury. *Moulden v. Greenbelt Consumer Services, Inc.,* 239 Md. 229, 232, 210 A. 2d 724 (1965); *Stem v. Nello L. Teer Co.,* 213 Md. 132, 140, 130 A. 2d 769 (1957) and cases therein cited. Where it appears from the plaintiff's own evidence, as it does in this case, that the injury may have resulted from a cause for which the defendant was not responsible, the plaintiff may not recover unless he excludes such independent cause. *Langville, supra.*

In *Otis Elevator Co. v. Embert,* 198 Md. 585, 600-02, 84 A. 2d 876 (1951), the plaintiff had sued the building company as owner of the building and the elevator in it for personal injuries sustained in the elevator. The building company impleaded Otis Elevator Company as a third party defendant alleging that Otis was liable to the building company for breach of contract to furnish maintenance on the elevator. The plaintiff filed an amended declaration against both the building company and Otis. The jury found a verdict for the plaintiff against both defendants and for Otis in the third party action. Only Otis appealed. The Court held that the prayers offered by Otis

for a directed verdict should have been granted. Judge Markell, for the Court, said that the scope of Otis's undertaking was limited to maintenance as distinguished from operation and that here the accident occurred because of failure to warn or instruct as to operation. In the present case there was even less evidence as to General Elevator's negligence than there was as to the elevator company in *Otis*. As has been pointed out, there was no evidence sufficient to show that General Elevator was to repair the hatchway doors on the floor involved or that General Elevator was to maintain whatever work it did do on July 28, 1961 in connection with the work done outside its maintenance contract, or that the accident was the result of anything which General Elevator did or did not do.

Dorsey cites *Dahms v. General Elevator Co.*, 214 Cal. 733, 7 P. 2d 1013 (1932), where a jury verdict against General Elevator was upheld on appeal. There, the elevator operator recovered for injuries when an elevator he was operating fell by reason of a broken hoisting shaft. General Elevator had a maintenance contract covering the elevator involved, and there was no indication that it did not cover the instrumentality which broke. In addition, one of the defendant's employees had inspected and found the elevator in proper running condition the day before the accident. In *Dahms* there was sufficient evidence of an undertaking to maintain the elevator shaft and the safety device which failed. In the case at bar there is insufficient evidence of an undertaking to repair or maintain the hatchway doors or the particular hatch door contacts that allegedly failed to operate properly.

Dorsey argues that an elevator is a highly dangerous instrumentality, and that one responsible for its repair and maintenance owes the same duty to third parties as does a manufacturer, citing *MacPherson v. Buick Motor Co.*, 217 N. Y. 382, 111 N. E. 1050 (1916), Restatement, Torts, § 385 (1934) and other authorities. We do not reach the question, for there was no evidence that General Elevator violated any duty which it owed to anyone.

Dorsey contends that there is a special presumption of negligence arising from a fall down an elevator shaft, and he seeks to invoke the *res ipsa loquitur* doctrine. But, in Dorsey's own

evidence, he has offered proof that General Elevator may not have had control of the instrumentality causing the injury. *Res ipsa loquitur* does not apply where the defendant does not have control of the instrumentality. *Lee v. Housing Authority of Baltimore City,* 203 Md. 453, 461-63, 101 A. 2d 832 (1954). See also *Leidenfrost v. Atl. Masonry,* 235 Md. 244, 201 A. 2d 336 (1964), and *Munzert v. American Stores Co.,* 232 Md. 97, 104, 192 A. 2d 59 (1963).

Dorsey also cites *Treadwell v. Whittier,* 80 Cal. 574, 582, 22 P. 266 (1889). In *Treadwell* the plaintiff sued the storeowners who operated an elevator for injuries sustained when the plaintiff was riding in the elevator. The jury was permitted to find the storeowners negligent, but the storeowners had control of the instrumentality causing the injury. The court said:

> "The law requires proof that plaintiff has sustained an injury by the breaking of the machinery by which he is carried or transported, and that such machinery was under the control and management of the defendant. When plaintiff has made such proof, he has made out a case which entitles him, if not rebutted or disproved, to recover of defendant."

In the case at bar, we have found there was insufficient proof of control of the instrumentality causing the injury, and the defendant is an elevator service company, not the owner-operator. The prevailing view is that the *res ipsa loquitur* doctrine is not applicable to elevator service companies when elevators are manually operated, because of lack of control. Annot., 56 A.L.R. 2d 1059, 1070 (1957).

Judge Carter denied General Elevator's motion for a directed verdict on the ground of Dorsey's contributory negligence. He granted the motion on the sole ground that there was no evidence sufficient to show negligence on the part of the defendant. His ruling on this phase of the motion was correct. In view of this holding, it is unnecessary to pass upon the question of contributory negligence.

> *Judgment affirmed; costs to be paid*
> *by appellant.*