## BAULSIR ET UX. *v.* SUGAR

[No. 372, September Term, 1971.]

*Decided July 7, 1972.*

The cause was argued before HAMMOND, C. J., and

BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ., and JAMES MACGILL, Chief Judge of the Fifth Judicial Circuit, specially assigned.

*George J. Thomas* for appellants.

*William A. Ehrmantraut,* with whom were *Donahue & Ehrmantraut* on the brief, for appellee.

MACGILL, J., delivered the opinion of the Court.

This is an appeal from the action of the trial court in directing a verdict for the appellee at the conclusion of the appellants' case in a suit where the appellants, husband and wife, sought to recover damages for alleged malpractice arising from an operation performed on the husband. The appellant, Robert L. Baulsir, a man in his early seventies, had been troubled by pains in his right leg and the treatment prescribed by his family physician had provided no satisfactory relief. At Mr. Baulsir's request, his physician, Dr. Thomas Maloney, furnished him with the names of three orthopedic surgeons, one of whom was the appellee, Dr. S. Jack Sugar. Mr. Baulsir consulted Dr. Sugar who arranged to have x-rays taken of him and to have him admitted to the Prince George's County General Hospital. Dr. Sugar diagnosed Mr. Baulsir's condition as degenerative arthritis of the right hip. On March 20, 1969, he performed on him an operation described as "a replacement arthroplasty of the right hip with a femoral head Austin-Moore prosthesis." On April 8, 1969, the prosthesis which had been inserted in Mr. Baulsir's right hip "subluxated" or became partially dislocated. On April 28, it had become completely dislocated and remained so until it was removed by another orthopedic surgeon, Dr. Lee A. Riley, on March 31, 1970. Mr. Baulsir was discharged from the Prince George's County General Hospital on May 22, 1969 and placed in the hospital's extended care facility where he remained until June 4, 1969.

After his operation and after his discharge from the extended care facility, Mr. Baulsir experienced constant pain in his leg and hip and he found himself no longer able to do the things he had been able to do before the operation. After his return to his home he was not further examined nor treated by Dr. Sugar and he made no attempt to see Dr. Sugar or to discuss his condition with him. He was, however, examined and treated, from time to time, by Dr. Maloney. According to Mr. Baulsir, Dr. Maloney treated him for boils which had broken out over his body. Mrs. Baulsir testified, however, that Dr. Maloney took the blood pressure of her husband and sent samples of his blood to the hospital for testing.

In the early months of 1970, Mr. Baulsir read a newspaper article about Dr. Lee A. Riley, who was associated with the Johns Hopkins Hospital. He brought the article to the attention of Dr. Maloney and Dr. Maloney arranged to have him examined by Dr. Riley on March 27, 1970. Dr. Riley had him admitted to the Johns Hopkins Hospital where he performed on him an operation which was described as the "removal of the Austin-Moore replacement prosthesis and conversion to a Girdlestone arthroplasty". The Girdlestone arthroplasty, while it greatly relieved the condition of Mr. Baulsir, left him with a permanently shorter leg and with the foot turned out.

As part of their case the appellants introduced into evidence the records of Prince George's County Hospital with respect to the hospitalization of Mr. Baulsir. These records showed that immediately following surgery Mr. Baulsir encountered a serious circulatory problem which required treatment. It was later found that the prosthesis had "luxated out of the acetabulum". The discharge summary, which was signed by Dr. Maloney, stated that:

> "The thought of some operative manipulation to reduce the dislocated procedures was held in the latter part of May 1969 and after consultation with Dr. Cameron, Holbrook, Sugar, and

the undersigned, it was felt that the patient represented a mildly severe medical risk and that the procedure should be deferred unless excellent chances with good results with minimal manipulation were forthcoming. Dr. Sugar requested a consultation with Dr. Eisenberg who reiterated the difficulties already expressed and it was the feeling that an open operation, when patient's condition warranted procedure, was probably the best course; however, x-rays showed calcification about the face of the prosthesis which, indicated to Dr. Sugar, would render manipulation extremely difficult. The patient was therefore discharged on May 22, 1969 to the Extended Care Facility to be treated there and then sent home for extensive rehabilitation, prior to further procedure".

The crux of the appellants' case appears to rest on the following testimony of their witness, Dr. Riley. In answer to the question of appellants' counsel "Doctor, in the field of orthopedic surgery, is the customary practice and proper standard of care anywhere in the United States to perform an Austin-Moore replacement and having dislocated, to leave it dislocated?" he replied, "As far as I know, it isn't, and that is why I suggested it be removed. . . . Assuming that other conditions are satisfactory to permit the procedure. . . . Assuming— this was a fairly broad question, and as a general rule, no, a dislocated Austin-Moore prosthesis should be surgically corrected, assuming that conditions are such that this can be undertaken". Later the witness was asked "Doctor, at the time you examined—strike that, at the time you performed the operation upon Mr. Baulsir, in your opinion based upon reasonable medical certainty was the removal—was he in such condition, physical condition, that the removal of the prosthesis by yourself was a proper standard of care to follow?" The witness answered "It was my feeling that it was, yes".

We have held that in reviewing the action of the trial

court in granting a directed verdict for a defendant at the conclusion of a plaintiff's case, we will, in testing the sufficiency of the evidence, resolve all evidentiary conflicts in favor of the plaintiff and assume the truth of all of the evidence and inferences that may naturally and legitimately be deduced therefrom in favor of the plaintiff's right to recover. *Durante v. Braun,* 263 Md. 685, 689, 284 A. 2d 241 (1971) ; *Home Insurance Company v. Metropolitan Fuels Company,* 252 Md. 407, 411, 250 A. 2d 535 (1969). We have also said that a plaintiff has not met his burden of proof if he presents merely a scintilla of evidence where the jury must resort to surmise and conjecture to declare his right to recover. *Plitt v. Greenberg,* 242 Md. 359, 367, 219 A. 2d 237 (1966) ; *Fowler v. Smith,* 240 Md. 240, 246, 213 A. 2d 549 (1965). A hypothesis resting on surmise and conjecture is not enough to warrant a submission of the case to the jury. *Dorsey v. General Elevator,* 241 Md. 99, 105, 215 A. 2d 757 (1966) ; *Moulden v. Greenbelt Consumer Services, Inc.,* 239 Md. 229, 232, 210 A. 2d 724 (1965).

In the case at bar there was no evidence that the operation performed by Dr. Sugar was negligently performed and it is settled that the mere fact that an unsuccessful result follows medical treatment is not of itself evidence of negligence. *Johns Hopkins Hospital v. Genda,* 255 Md. 616, 258 A. 2d 595 (1969) ; *Riley v. U. S.,* 248 F. Supp. 95 (D. Md. 1965) ; *Lane v. Calvert,* 215 Md. 457, 462, 138 A. 2d 902 (1958) ; *Bettigole v. Diener,* 210 Md. 537, 541, 124 A. 2d 265 (1956). In fact, the appellants do not make such a contention. They contend, rather, that there was legally sufficient evidence to make out a prima facie case showing that Dr. Sugar abandoned Mr. Baulsir after he had performed the operation on him and that he did not administer the proper standard of postoperative care to him. The two contentions are inter-related and will be considered together.

It has been held that "an operating surgeon must, after performing an operation, exercise the same skill and judgment in the subsequent necessary treatment as in

performing the operation unless excused by the terms of employment or by the patient and may be held answerable in damages for failure to exercise such skill and judgment in the postoperative care and treatment of the patient." *Wooten v. Curry*, (Tenn. App.) 362 S.W.2d 820, 93 A.L.R.2d 307 (1961) ; *Dashiell v. Griffith*, 84 Md. 363, 35 A. 1094 (1896) ; Annotation, *Liability of physician who abandons case*, 57 A.L.R.2d 452 (1958).

It could be supposed that Mr. Baulsir's condition, following his discharge from the hospital, required medical rather than surgical attention, but assuming without deciding that the appellants had made out a prima facie case of abandonment by Dr. Sugar following the operation and therefore negligence on his part, it does not follow that they had thereby made out a prima facie case for submission to the jury in the absence of additional and sufficient evidence that such abandonment was the proximate cause of Mr. Baulsir's condition for which recovery is sought. We have said that "the burden of proof in a malpractice case is on the plaintiff to show a lack of the requisite skill or care on the part of the physician and that such want of skill or care was a direct cause of the injury; if proof of either of these is wanting, the case is not a proper one for submission to the jury." *Suburban Hospital Association, Inc. v. Mewhinney*, 230 Md. 480, 187 A. 2d 671 (1963) ; *State, Use of Kalives v. Baltimore, etc. Hospital*, 177 Md. 517, 526, 10 A. 2d 612 (1940). We have also recently reiterated the rule, in *Johns Hopkins Hospital v. Genda, supra*, that in cases of this nature it is incumbent on the plaintiffs to introduce sufficient evidence from which a jury could determine (1) the standard of skill and care ordinarily exercised by surgeons in cases of this kind and (2) that the defendant failed to comply with those standards.

The hospital records indicated that Dr. Maloney was in attendance at the hospital and was consulted by Dr. Sugar following the operation. It was the consensus of the physicians in consultation that Mr. Baulsir should be sent home for "extensive rehabilitation" before further

surgical procedures should be attempted. Dr. Riley was of the opinion, from an examination of the hospital records, that at the time of Mr. Baulsir's discharge from the hospital his condition made him "a moderately severe surgical risk". Mrs. Baulsir had testified that the operation by Dr. Riley was delayed because "My husband was in a bad condition. He had this blood trouble and he had abscesses and he had all this stuff that had to be doctored first. Dr. Maloney had to get him in condition". Dr. Riley did not testify, and there was no evidence to suggest, that during the period between Mr. Baulsir's discharge from the extended care facility and the time he was operated on by Dr. Riley, he did not receive that degree of care and treatment ordinarily exercised in such cases as his condition required or that his condition worsened for lack of such care and treatment. Likewise, there was no evidence that his condition was such during that period that an operation to remove the prosthesis could have been performed with safety to his health. See, *Horton v. Vickers,* 142 Conn. 105, 111 A. 2d 675 (1955), and *Ferguson v. Glenn,* 201 N. C. 128, 159 S. E. 5 (1931), cases somewhat similar on the facts. "In matters of proof we are not justified in inferring from mere possibilities the existence of facts; there must be proof of the essential facts to fix liability upon a party charged with a wrongful act." *Fink v. Steele,* 166 Md. 354, 171 A. 49 (1934). *Suburban Hospital Association, Inc. v. Mewhinney, supra.* Since there was insufficient evidence to establish a causal connection between the abandonment, if abandonment there was, and the eventual condition in which Mr. Baulsir found himself, we find no error on the part of the trial court in granting the directed verdict. *Carroll v. Griffin,* 96 Ga. App. 826, 101 S.E.2d 764 (1958); *Skodje v. Hardy,* 47 Wash. 2d 557, 288 P. 2d 471 (1955); *Gray v. Davidson,* 15 Wash. 2d 257, 130 P. 2d 341 (1942).

The appellants complain that the trial judge should not have sustained objections to questions of their counsel put to Dr. Riley and designed to show that the pres-

ent unfortunate condition of Mr. Baulsir was attributable to the leaving of the prosthesis in his thigh. Since, as we have observed, there was no evidence that the prosthesis should, or could with safety, have been removed earlier, affirmative answers to the questions, if allowed, would not change the conclusion we reach. We need not consider the other complaint that the trial judge erroneously considered and weighed certain evidence as a basis for his action in granting the directed verdict, since we find that, in any event, his action was correct.

*Judgment affirmed, costs to be paid by appellants.*