585 A.2d 841

**James Robert DAVIS, III, et al.**

v.

**JOHNS HOPKINS HOSPITAL.**

**No. 288, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Feb. 13, 1991.

Angus R. Everton (Robert C. Morgan, Kenneth M. Robinson, Gilbert F. Shelsby, Jr. and Montedonico & Mason, Chartered, on the brief), Baltimore, for appellants.

Joseph G. Finnerty, Jr. (Jonathan D. Smith, Glen K. Allen and Piper & Marbury, on the brief), Baltimore, for appellee.

Argued before MOYLAN, BISHOP and JAMES S. GETTY (Retired, Specially Assigned), JJ.

BISHOP, Judge.

James Robert Davis, III (Bobby), by and through his mother and next friend, Deborah Davis, and James Robert

Davis, Jr. and Deborah Davis, individually, appellants, appeal from the adverse ruling of the Circuit Court for Baltimore City granting the Motion for Judgment of appellee Johns Hopkins Hospital (Hopkins).

## ISSUES

This case presents the issues of whether there was sufficient evidence:

(1) to support appellants' claim of negligence to require submission of the issue to the jury;

(2) to support appellants' claim of abandonment to require submission of the issue to the jury;

(3) to support appellants' claim of breach of contract to require submission of the issue to the jury; and

(4) to support appellants' claim that appellee failed to conform to the statutory requirements in producing requested medical records to require submission of the issue to the jury.

Within the medical malpractice context, we will discuss two issues, for which there is little law in Maryland: first, the duty of a hospital to accept a patient, second, the abandonment of a patient by a hospital. Also, we will address the issue of the duty of a hospital or related institution to disclose medical records under Md. Health–General Code Ann. § 4–302(d)(2) (1990).[1]

## FACTS

### 1. *Procedural History*

Appellants initiated this case by filing a complaint with the Health Claims Arbitration Office. Md.Cts. & Jud.Proc.

---

1. Md. Health–General Code Ann. § 4–302(d)(2) (1990) provides:
    If a facility refuses to disclose a medical record within a reasonable time after a person in interest requests the disclosure, the facility is, in addition to any liability for actual damages, liable for punitive damages.
   This section will be repealed and replaced by § 4–309 effective July 1, 1991. Section 4–309 will provide for actual damages and certain criminal penalties. There will be no provision for punitive damages.

Code Ann. § 3–2A–04 (1989). The complaint contained three counts, all alleging that appellee negligently delayed in admitting Bobby to Hopkins causing Bobby to suffer severe brain damage. Count I sought damages for Bobby's pain and suffering; Count II was for the medical expenses, past and future, and an award to his parents for their loss of Bobby's companionship; and Count III was for the disruption of the Davises' familial and marital relationships. The case was arbitrated and the panel ruled in favor of Hopkins.

In accordance with Md.Cts. & Jud.Proc.Code Ann. § 3–2A–06 (1989), appellants filed an Action to Nullify Award and a Complaint in the Circuit Court for Baltimore City. This complaint was the same as the complaint filed with the Health Claims Arbitration Office. Four months later, appellants filed an amended complaint and election for jury trial. The amended complaint incorporated by reference the three counts of the original complaint and added four more. Count IV alleged that appellee refused to provide appellants copies of Bobby's medical records in violation of Md. Health–General Code Ann. § 4–302 (1990) resulting in additional expense, pain and suffering. Count V alleged abandonment of Bobby and claimed that appellee refused to provide care to Bobby as agreed. Count VI, which alleged breach of contract, claimed that appellee initially refused to treat Bobby as "promised, contracted and agreed." Count VII alleged that appellee maliciously interfered with the Davises' efforts to obtain medical care for Bobby elsewhere.

The trial court granted appellee's Motion for Summary Judgment on Counts III (disruption of familial and marital relationship) and VII (malicious interference with care), and partial summary judgment on Count II (medical expenses and loss of companionship of parents due to negligence) by limiting recovery to medical expenses. The court also granted appellee's Motion for Bifurcation of the liability and damages issues. Appellants have not complained of these rulings and they are not before us. Md.Rule 8–504; *Jaco-*

*ber v. High Hill Realty, Inc.*, 22 Md.App. 115, 321 A.2d 838 (1974).

The remaining counts went to trial before a jury. After argument on Hopkins' Motion for Judgment, the court granted judgment on Count IV (medical records) but denied judgment on the remaining counts. At the close of all the evidence, the court granted judgment in favor of Hopkins on the remaining counts: I (pain and suffering of Bobby due to negligence), II (medical expenses of Bobby due to negligence), V (abandonment) and VI (breach of contract).

## 2. Medical History

Bobby was born on December 12, 1979. At about eight months old, Hopkins diagnosed that Bobby suffered from status epilepticus, a disorder in which the victim sustains a series of prolonged seizures accompanied by difficulty in breathing. If not treated properly, a seizure could result in brain damage or death due to lack of oxygen. Bobby also suffered from status asthmaticus (long, unremitting asthma attacks) and cerebral palsy. Bobby was a patient of Hopkins since these conditions were first diagnosed.

Because Bobby lived with his family in Anne Arundel County, whenever Bobby would have an attack, emergency medical assistance was provided initially by paramedics of the Anne Arundel Fire Department (AAFD). AAFD protocol required that a patient in a seizure and in need of hospitalization would be taken to the nearest hospital which, in Bobby's case, was North Arundel County Hospital (NACH). On one occasion, while receiving emergency treatment for a seizure, Bobby went into respiratory arrest at NACH. On another occasion, treatment was delayed because a staff member at NACH was unfamiliar with one of Bobby's medications. Concerned that Bobby's condition was too complex for the NACH staff, Mr. Davis sought to have Bobby transported directly to Hopkins for treatment of future seizures. In order to deviate from its protocol, AAFD officials told Mr. Davis that a letter was required

from Hopkins stating that it was medically acceptable to transport Bobby directly to Hopkins.

After Mr. Davis conferred with Dr. Shlomo Shinnar, one of Bobby's neurologists at Hopkins, the following letter was prepared on the Hopkins' letterhead, signed by Dr. Shinnar and his superior, Dr. John M. Freeman:

February 9, 1981

Department of Neurology
Chief Roger C. Simonds
Emergency Medical Service Division
Anne Arundel County Fire Department
P.O. Box 276
Route 3
Millersville, MD 21108
Dear Chief Simonds:

RE: James Davis

I am writing to you concerning special transportation arrangements for James Davis. James is a one year old child with a complex seizure disorder who is followed by us at the Pediatric Neurology clinic at Johns Hopkins. He is currently on multiple medications including phenobarbital, clonazepam and valproate. When James goes into status epilepticus, which he does frequently with high fevers, he is difficult to manage. In the past he has required transfer to the Johns Hopkins Pediatric Intensive Care Unit or the Pediatric Neurology ward each time. Initial management at the outlying hospital was at times delayed secondary to lack of familiarity with James' complex seizure disorder. I feel that in view of these problems it would be better to transport James directly to the Johns Hopkins Pediatric Emergency Room with advance warning by radio to the ER and pediatric neurology. There are always risks in transporting a seizing child, but I feel that they are in this case justified. These risks have been explained to James' parents who understand and support this decision. I will be glad to provide more details on request.

Sincerely,
Shlomo Shinnar, M.D., Ph.D.
Department of Pediatric
Neurology
John M. Freeman, M.D.
Director
Pediatric Neurology
Department

In the event Bobby could not be treated at Hopkins, Dr. Shinnar and other Hopkins physicians provided the Davises with "To Whom It May Concern" letters that listed the dosages of his current medication, the medication necessary to stop his seizures and other instructions on how to manage his condition. As Bobby's condition and thus his treatment changed, the letters were updated. Seven letters were drafted and delivered to the Davises. The Davises always carried a copy of the latest letter with them. In August 1982, Bobby was taken to the Medical College of Virginia Hospital because he began seizing while at Kings Dominion, an amusement park nearby. Through the use of the latest letter the paramedics and the doctor at the hospital properly treated Bobby.

Based on the receipt of the February 9, 1981 letter, Chief Simonds of the AAFD directed the paramedic units to transport Bobby directly to Hopkins. As a result, from February 9, 1981, until July 1982, Bobby was transported to Hopkins nine times by ambulance and twice by helicopter. Hopkins never designated which method of transportation was preferable. In July 1982, the AAFD decided always to transport Bobby by helicopter, weather permitting. An AAFD mobile paramedic unit would take Bobby to a rendez-vous point where a waiting helicopter would transport him to Hopkins. Between July 1982 and March 2, 1983, Bobby was transported to Hopkins eight times by helicopter and once by ambulance because of fog. By ambulance, the trip from the Davis' home to Hopkins took approximately thirty five minutes. By helicopter, the same trip took approxi-mately twelve minutes plus a few minutes for the time to

travel by ambulance from the Davis' home to the rendez-vous point.

Bobby's mode of transportation determined the unit at Hopkins to which he was delivered. When brought by ambulance, he arrived at the Pediatric Emergency Room located on the first floor. When brought by helicopter, he was landed on the roof of the Children's Center (14th floor) and then taken to the Pediatric Intensive Care Unit (PICU) located on the 7th floor.

The PICU at Hopkins is part of the Maryland Institute for Emergency Medical Services System (MIEMS). *See* Md. Education Code Ann. § 13–103 (1989). The MIEMS System is designed to provide emergency care to persons through-out Maryland and Washington, D.C. Involved are hospitals, state and county agencies that provide treatment and trans-portation to hospitals, and a communications network that coordinates the process.[2]

At times, the demand on the PICU staff and facilities is so great that it cannot accept additional patients without risking the health of the new patient or those already in the PICU. This is never the case with the Pediatrics Emergen-cy Room. When the PICU is in a non-accepting condition it notifies the MIEMS System that it is to be placed on "fly-by" status which means that patients who are to arrive by helicopter to the PICU are directed, at the time of the initial radio contact, to the next comparable unit in the MIEMS System which, in this case, was the Children's Hospital in Washington, D.C. The helicopter trip from the Davis' home to Children's Hospital was approximately eigh-teen minutes, six minutes more than the trip to Hopkins.

Even when the PICU was on fly-by status, it received calls through the MIEMS System communication network. On occasion, the paramedics at the scene were able to convince the physician in charge of the PICU to accept a

---

**2.** Although relevant regulations were not included in the Record Extract, all parties agreed with the purpose and procedures of the MIEMS System as set out in this opinion.

patient even though the PICU was on fly-by status. On other occasions, the physician in charge would not make an exception. At times, even when it was on fly-by status, the PICU provided consultation to paramedics on the scene, though the patient was to be flown to another hospital. The Davises were not informed of the possibility that the PICU might go on fly-by status and, as a result, refuse to accept Bobby when transported by helicopter.

In the early morning hours of March 2, 1983, three year old Bobby began seizing at home. Mrs. Davis called the paramedics who arrived at the Davis' home, loaded Bobby, accompanied by his father, into the ambulance and drove to the rendezvous with the waiting helicopter. Paramedic Calvin Cavey, the ambulance driver, called Hopkins to advise that Bobby was seizing and that he was to be flown by helicopter to the PICU. The call was patched through to both the PICU and the emergency room.[3] Dr. Morrow, a resident physician in the PICU, responded that the PICU was on fly-by status and therefore Bobby should be taken to NACH, the nearest hospital. This was refused. Dr. Morrow then said Bobby should be flown to Children's Hospital in Washington, D.C.[4] This procedure was also refused. Mr. Cavey read the February 9, 1981 letter to Dr. Morrow. At about the same time, Trooper Deal, the medical observer on the helicopter, entered the conversation and demanded admission to Hopkins for Bobby. Dr. Nancy Setzer, Dr. Morrow's supervisor, was contacted by Dr. Morrow and advised of the situation. Dr. Setzer authorized Bobby's admission to the PICU. Dr. Morrow relayed this to Mr. Cavey. The admission discussion lasted between ten and fourteen minutes. Bobby, accompanied by his father, was then loaded into the helicopter and flown to Hopkins. The flight took thirteen minutes. During the flight, a

---

**3.** The record does not disclose whether this is the Pediatric Emergency Room.

**4.** At the time of the first radio contact, Dr. Morrow was not aware of Bobby's prior relationship with Hopkins. Also, at that time Bobby was in an ambulance and NACH was the nearest facility by road.

patient was moved out of the PICU to make room for Bobby.

Bobby required ventilation during transportation from his house to Hopkins. He was ventilated in the ambulance with an "airway" which held down his tongue to ensure good air passage into his lungs. A pediatric airbag with pure oxygen was then placed over Bobby's mouth and squeezed to force oxygen into his lungs. Bobby was being ventilated in this manner from the time he was loaded in the ambulance until he was loaded in the helicopter, after the discussion between Mr. Cavey and Dr. Morrow. During the helicopter flight, Bobby retained the "airway" in his mouth, but Trooper Deal was not able to use the pediatric airbag to force oxygen into Bobby's lungs. Instead, Trooper Deal used a nonrebreather mask, a soft, clear plastic mask connected by a tube to a cylinder of oxygen which fits over the patient's mouth and nose.

Bobby was landed on the roof of the Children's Center at Hopkins and immediately treated. Bobby suffered severe brain damage due to the events of March 2, 1983.

### 3. *Medical Records*

In October 1983, Mr. Davis and his counsel went to Hopkins to review and copy Bobby's records and were told that volumes containing records of admissions from late 1980 through 1982 were missing. All other records were produced. Lisa Cowalt, the Senior Claims Coordinator for Hopkins, as well as other Hopkins personnel, periodically searched for the records in the various clinics and in-patient areas where Bobby was treated. In February 1986, a Request for Production of Documents,[5] filed by Davises' counsel, demanded all medical records for Bobby. The records for 1981 were produced in April 1987. In August 1989, counsel for the Davises noted the deposition of Lottie Cole, head of the Medical Records Department of Hopkins, to determine the whereabouts of the missing 1980 and 1982 records. On the business day before the deposition, Ms.

---

5. Md.Rule 2–422.

Cowalt asked the Medical Records Department to search for the missing records. Forty-five minutes later the records were located. The records were produced the following business day, less than one month before trial. Ms. Cowalt testified that no one at Hopkins ever withheld any medical records from appellants and that both counsel received the same records at the same time.

## DISCUSSION

A motion for judgment, Md.Rule 2–519,[6] must be denied and the case must be submitted to the jury if there is any admissible evidence, however slight, legally sufficient as tending to prove negligence or other right of the plaintiff to recover. *Beahm v. Shortall*, 279 Md. 321, 341–2, 368 A.2d 1005 (1977); *Montgomery Ward & Co. v. McFarland*, 21 Md.App. 501, 513, 319 A.2d 824 (1974). Once the court determines that there is sufficient evidence to generate a jury question, it is for the jury to assess and evaluate the weight to be assigned to the evidence. Neither the trial court nor this Court is permitted to substitute its evaluation for that of the jury. *Thodos v. Bland*, 75 Md.App. 700, 713–14, 542 A.2d 1307 (1988) (citations omitted). Thus, only where it is manifest to the court upon the uncontradicted evidence that there is no rational basis upon which a verdict can be for the plaintiff, may the court grant a motion for judgment in favor of the defendant. *Montgomery Ward*, 21 Md.App. at 513–14, 319 A.2d 824.

### 1. *Negligence*

Three basic elements are necessary to state a cause of action in negligence. First, the defendant must be under

---

6. Md.Rule 2–519 provides in part:
   **(b) Disposition.**—When a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and to render judgment against the plaintiff or may decline to render judgment until the close of all the evidence. When a motion for judgment is made under any other circumstances, the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made.

a duty to protect the plaintiff from injury. Second, the defendant must fail to discharge that duty. Third, the plaintiff must suffer actual loss or injury proximately resulting from that failure.

*Lamb v. Hopkins*, 303 Md. 236, 241, 492 A.2d 1297 (1985) (citations omitted). Because medical malpractice is a type of negligence, the burden of proof, as in any case founded upon negligent conduct, rests with the plaintiff. *See Shilkret v. Annapolis Emergency Hospital*, 276 Md. 187, 190, 349 A.2d 245 (1975); *Suburban Hospital Ass'n v. Mewhinney*, 230 Md. 480, 484–5, 187 A.2d 671 (1963).

The existence and scope of a legal duty in a medical malpractice action is a question of law for the courts. *Farwell v. Un*, 902 F.2d 282, 288 (4th Cir.1990) (determination of a doctor's duty to a patient under Maryland and Delaware law) *citing* W. Keeton, *Prosser & Keaton on Torts* § 37, at 236 (5th ed. 1984) (hereinafter *Prosser* ).[7] *Prosser* states that this determination is made by reference to the body of statutes, rules, principles and precedents which make up the law. § 37, at 236. " '[D]uty' is . . . an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Jacques v. First Nat'l Bank*, 307 Md. 527, 533, 515 A.2d 756 (1986) *quoting Prosser* § 53, at 357. This is in accord with Maryland case law on negligence generally. *See, e.g., Jacques*, 307 Md. at 540–45, 515 A.2d 756. (bank which agreed to process a loan application owed the customer a duty of reasonable care in processing and determination of that application); *Lamb*, 303 Md. 236, 492 A.2d 1297 (a probation officer does not owe a duty to individuals injured by the negligence of a probationer); *Scott v. Watson*, 278 Md. 160, 167, 359 A.2d 548 (1976) ("Maryland law does not impose upon the landlord of an urban apartment

---

7. *But see Hunt v. Palm Springs General Hospital*, 352 So.2d 582, 585 (Fla.App.1977) which held that the question of whether the General Hospital owed Hunt a duty of care despite his non-admitted status while he lay in its emergency area was for the jury to determine.

complex a special duty to tenants to protect them from the criminal acts of third parties committed in common areas within the landlord's control ... [but only] to exercise reasonable care for the tenant's safety....").

To determine whether a tort duty should be recognized in a particular context, the Court of Appeals in *Jacques* provided this guidance:

[T]wo major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability.... [In other words,] an inverse correlation exists between the nature of the risk on one hand, and the relationship of the parties on the other. As the magnitude of the risk increases, the requirement of privity is relaxed—thus justifying the imposition of a duty in favor of a large class of persons where the risk is of death or personal injury. Conversely, as the magnitude of the risk decreases, a closer relationship between the parties must be shown to support a tort duty.

307 Md. at 534–5, 537, 515 A.2d 756 (citations and footnotes omitted).

Whether a duty exists in a medical malpractice action is a separate question from the general standard of conduct or the specific conduct necessary to meet the general standard. The general standard of conduct is again a matter of law to be decided by the court. *Prosser* § 37, at 236–7. Once a duty is found, the duty requires that the defendant's general conduct conform at least to that of a reasonable person under the same or similar circumstances. *Id.* Applied to hospitals, the general standard of conduct is

that a hospital is required to use that degree of care and skill which is expected of a reasonably competent hospital in the same or similar circumstances. As in cases brought against physicians, advances in the profession, availability of special facilities and specialists, together with all the relevant considerations, are to be taken into account.

*Shilkret,* 276 Md. at 202, 349 A.2d 245. As it is impossible to prescribe definite rules in advance for the specific conduct which is reasonable in every circumstance, the determination in doubtful cases is for the jury. *Prosser* § 37, at 237–8; *Shilkret,* 276 Md. at 203, 349 A.2d 245; *Johns Hopkins Hospital v. Genda,* 255 Md. 616, 620, 258 A.2d 595 (1969).

■ At common law, "a private hospital is not under a ... duty to serve everyone who applies for treatment.... In the absence of statute, it may accept some applicants and reject others." *Levin v. Sinai Hospital of Baltimore,* 186 Md. 174, 180, 46 A.2d 298 (1945). This was founded on the principle that there is generally no duty to aid another who is in peril. *Prosser* § 56, at 375. Nevertheless, liability has been imposed on an institution which voluntarily undertakes to provide services to the public and the plaintiff, in reliance upon the institution's practice, is injured as a result of the institution's refusal to provide the service to him. *See, e.g., Erie R.R. v. Stewart,* 40 F.2d 855 (6th Cir.), *cert. denied,* 282 U.S. 843, 51 S.Ct. 34, 75 L.Ed. 748 (1930) (the railroad was not under a legal duty to provide a watchman at a road crossing, but became liable to plaintiff when it failed to give adequate warnings after having voluntarily provided one). Similarly, many courts have found that private hospitals which voluntarily create and staff emergency rooms are under an implied duty to render medical care to the patient who has relied upon a well-established custom of the hospital to render aid in such a case. *See, e.g., Wilmington General Hospital v. Manlove,* 174 A.2d 135 (Del.1961); *Williams v. Hospital Authority,* 119 Ga.App. 626, 168

S.E.2d 336 (1969); *Stanturf v. Sipes*, 447 S.W.2d 558 (Mo. 1969); *Valdez v. Lyman–Roberts Hospital*, 638 S.W.2d 111 (Tex.App.1982); *Mercy Medical Center of Oshkosh v. Winnebago County*, 58 Wis.2d 260, 206 N.W.2d 198 (1973); *Thompson v. Sun City Community Hosp., Inc.*, 141 Ariz. 597, 688 P.2d 605 (1984). There are, however, no Maryland cases which directly address the issue of a hospital's duty to treat a person in need of emergency aid, and the Maryland Legislature has not created such a duty by statute.

We have located only one case which has addressed the circumstance where a hospital has refused treatment because it has reached its capacity. In *Costa v. Regents of Univ. of Calif.*, 116 Cal.App.2d 445, 254 P.2d 85 (1953), Costa was given radiation treatments for mouth tumors at University of California Hospital. His condition became worse and approximately two years later, after sporadic out-patient treatment, Costa sought admission for in-patient treatment. The hospital refused because there was no available bed and told Costa that steps could be taken to have him hospitalized elsewhere. Costa was then admitted and treated at another hospital. He was released, but over the next eleven months his condition deteriorated greatly. He was admitted at a third hospital where he received both in and out-patient treatment for approximately six months. Costa then sued University of California Hospital for, *inter alia*, negligence in not admitting him for in-patient treatment. The court found no negligence by the hospital:

> The refusal to hospitalize appellant ... because no bed was available although defendants declared that hospitalization was necessary cannot constitute negligence because there is no duty, contractual or otherwise for a University Hospital to hospitalize persons with whom they have only contracted for outpatient's services, and certainly no duty to have beds available for them whenever they may need them.

*Id.*, 254 P.2d at 95.

A hospital cannot reasonably be required to render medical aid when it does not have the facilities to do so.

Surely no emergency treatment has eve[r] been denied solely because of the legal right of the hospital to refuse treatment. It is to be expected, on the other hand, that treatment might be refused if the case is nonemergent or if the emergency facilities are full.

Powers, *Hospital Emergency Service and the Open Door,* 66 Mich.L.R. 1455, 1459–60 (1968). This is especially the case when the patient can be referred to another hospital with available facilities. *See Thompson,* 688 P.2d at 609–11 (reasonable "cause" for transfer before completion of emergency care refers to medical considerations relevant to the welfare of the patient and not economic considerations relevant to the welfare of the hospital.)

▆ Upon examination of the authorities cited, we hold that a hospital is under no duty to accept a person with an emergency condition when there are no facilities available to treat the person properly. A hospital cannot be placed in the position where the admission of an additional patient will jeopardize the care of its existing patients. Therefore, when it becomes necessary to move a patient out of a unit in order to accept another, the hospital is under no duty to accept that person as a patient, if, in the doctor's best medical judgment, it would be unreasonably dangerous to move the already accepted patient.

In the case *sub judice,* the court granted judgment for Hopkins on the issue of negligence because it found as a matter of law that Hopkins owed no duty to Bobby to accept him into the PICU when it was on fly-by status. The uncontradicted evidence established the following facts. First, that the PICU was full and on fly-by status. Second, that the MEIMS System established the standard, medically proper procedure under this circumstance to be to route persons seeking admission to the PICU to Children's Hospital in Washington, D.C., a comparable and capable facility to treat Bobby's condition. Third, that this was the proce-

dure Dr. Morrow attempted to follow.[8] Fourth, that a patient was moved out of the PICU to make room for Bobby in order to accept him into the PICU as an exception to the fly-by status. Under these circumstances, Hopkins was under no duty to accept Bobby because the PICU facilities and staff were inadequate to care for him. Moreover, Bobby was not sent away untreated, but directed to the nearest capable and available facility in compliance with the MIEMS System procedures, which were established to provide the best care for emergency patients.

We are unconvinced by appellants' contention that Hopkins should have admitted Bobby into one of its other units as his parents were unaware of the possibility of fly-by. Each unit at Hopkins is a separate entity with its own procedures. In fact, the Pediatric Emergency Room to which Bobby was admitted when he came by ambulance was fourteen floors away from the roof where the helicopter landed and seven floors away from the PICU. Furthermore, no evidence was presented to demonstrate that Bobby would have reached the Pediatric Emergency Room, assuming it could have treated him with the same expertise as Children's Hospital, in less time than the six additional minutes it would have taken to fly Bobby to Children's Hospital.

In essence, appellants concede that the PICU's fly-by status and the MIEMS System response procedures were proper in the general case, but urge that they amounted to negligence in the specific care of Bobby. There is evidence of a long term treatment relationship between Bobby and Hopkins; however, it was not one of continuous in-patient care, but one of sporadic emergency admissions followed by in-patient care and discharge. To find for appellants on the issue of duty would require Hopkins to have staff and facilities available to treat Bobby in the event he had a seizure. This we will not do. Because we hold that Hopkins owed no duty to admit Bobby, Hopkins cannot be

---

8. *See supra* note 4.

negligent in the procedure that it followed and the delay that resulted therefrom. Based on this holding we do not reach the breach of duty and causation aspects of this case.

## 2. *Abandonment*

■ Appellants contend that Hopkins abandoned Bobby during the period of time when it delayed in admitting him. There is little law in Maryland on the issue of the abandonment of a patient by a physician. In the medical malpractice context, abandonment has been defined as "the physician's unqualified refusal to further attend to the patient's need, even though his refusal to act is not accompanied by an express declaration that he is withdrawing from the case." Annotation, *Physician—Abandonment of Case*, 57 A.L.R.2d 432, 446 (1958). *See, also, Dashiell v. Griffith*, 84 Md. 363, 381, 35 A. 1094 (1896); *Baulsir v. Sugar*, 266 Md. 390, 395–6, 293 A.2d 253 (1972).

The court in the case *sub judice* found insufficient evidence of abandonment:

> The abandonment which is Count Five, requires an obligation to treat. Treatment has begun and after treatment is terminated without alternative care which causes damages. The Court in this case finds the delay, if we wish to call it that as the Plaintiff's have characterized it, is not a termination and it is as [a] matter of fact, an alternative care plan [which] was suggested and was implemented ... for that particular purpose.

After a review of the evidence, in a light most favorable to appellant, we agree.

At the time of Bobby's seizure, the PICU was on fly-by because the staff was overtaxed and could not safely accept another patient. Appellants do not contend that fly-by status was improper. Although exceptions are made, the fly-by protocol was to send patients destined for the PICU to Children's Hospital in Washington, D.C. Dr. Morrow testified that when he received the call from Mr. Cavey it was his best medical judgment that Bobby needed to go to NACH and when this was refused, he suggested Children's

Hospital.[9] When this was also refused, an exception to fly-by status was made for Bobby and he was admitted to the PICU.

There was no evidence of an "unqualified refusal" to treat Bobby. Instead, Dr. Morrow testified that his suggestions were made to provide Bobby with better care than Hopkins could provide during fly-by status. This was also the purpose of the MIEMS System. There was no evidence to contradict this assertion by Dr. Morrow. Appellants' experts, Drs. Kennedy and Greenberg, did not address the issue of abandonment. A referral, even if negligently made, if made in the doctor's best medical judgment does not amount to abandonment. A hypothesis resting on surmise and conjecture is not enough to warrant a submission of the issue to the jury. *Baulsir,* 266 Md. at 395, 293 A.2d 253.

### 3. *Contract*

■ Under its "Argument," appellants' first sub-heading states,

"I. THE COURT ERRED IN GRANTING THE MOTION FOR JUDGMENT:

A. On the issues of general negligence and breach of contract."

Nevertheless, the nineteen pages of argument under this sub-heading are devoted exclusively to appellants' negligence claim. Contrary to the requirements of Md.Rule 8–504(a)(5), (7) (formerly Rule 831(c), (d)), neither appellants' brief nor their reply brief contains any argument in support of its contract claim. Under these circumstances, we conclude that the point has been waived and does not require an answer. Md.Rule 8–504(c); *Larmore v. Larmore,* 241 Md. 586, 589, 217 A.2d 338 (1966). "Surely it is not incumbent upon this Court, merely because a point is mentioned as being objectionable at some point in a party's brief, to scan the entire record and ascertain if there be any ground,

---

**9.** *See supra* note 4.

or grounds, to sustain the objectionable feature suggested."
*State Roads Commission v. Halle*, 228 Md. 24, 32, 178 A.2d
319 (1962).

### 4. *Medical Records*

■   Md. Health–General Code Ann. § 4–302(d)(2) (1990)
imposed liability on a hospital which "refuses to disclose a
medical record within a reasonable time" after request by
or on behalf of a patient.   We have determined "refuse"
within the meaning of the statute to be "intentional, as
opposed to negligent or contractual, conduct." *Laubach v.
Franklin Square Hospital*, 79 Md.App. 203, 218, 556 A.2d
682 (1989), *aff'd*, 318 Md. 615, 569 A.2d 693 (1990).

In *Laubach*, Timothy and Nancy Laubach (Laubachs)
sued Franklin Square Hospital (hospital) for violation of
Health–General § 4–302 which arose out of a separate
medical malpractice action.   The Laubachs contended that
the hospital violated the statute by not producing fetal
monitoring tracings (tracings).   The hospital countered with
a two-fold argument;   that it did not refuse to produce the
tracings because it did not *"mentally* determine[ ] not to
comply," 79 Md.App. at 219, 556 A.2d 682 (emphasis in
original), and that the tracings were not medical records.
*Id.* at 225, 556 A.2d 682.   The court denied cross-motions
for summary judgment and the issue proceeded to trial
before a jury, at the conclusion of which, a verdict was
entered in favor of the Laubachs.   The jury assessed dam-
ages at one million dollars.

The hospital appealed arguing that the record was devoid
of any evidence of a refusal.   We rejected this argument
finding sufficient evidence to send the issue to the jury.
"Whether, as the hospital has recognized, and, indeed, ar-
gued below, the hospital merely failed to comply or, by an
act of volition, refused to comply is a question to be
answered by the jury after proper instructions." *Id.* at 221,
556 A.2d 682.   In addition, we found sufficient evidence to
uphold the jury's verdict, stating:

There was evidence in the record that counsel for appellants, in communications with counsel for the hospital, in connection with a malpractice action filed by appellants against the hospital and others, specifically requested that the fetal heart monitoring tracings be produced. This request was made in connection with appellants' medical malpractice action against the hospital and others. Moreover, appellants' counsel testified that that was not the first discussion he had had with the hospital concerning appellants' need for the tracings. This is confirmed, it appears, by a letter, dated September 7, 1984, from appellee Gately to the chairman of the Health Claims Arbitration panel. In that letter, Gately reported, based on conversations with appellee Rifkin and hospital personnel, that a prior investigation to locate the tracings had failed to turn them up; he concluded that they were not available. In addition to the evidence that appellants requested fetal monitoring tracings, there is evidence in the record that the hospital was on notice as to appellants' need for, and desire to have, them.

*Id.* at 224, 556 A.2d 682.

In affirming the decision of this Court, the Court of Appeals held, "To achieve these purposes, no more than a mere refusal to disclose within a reasonable time, upon proper request, whether done maliciously or not, results in liability for punitive damages in addition to actual damages." *Laubach,* 318 Md. at 622, 569 A.2d 693.

As noted in the facts, *supra,* the 1981 medical records were not produced until over a year after they were due to be produced and the 1982 records were not produced until almost three and one-half years after they were due. The 1982 records were located forty-five minutes after Ms. Cowalt requested the Medical Records Department to search for them on the business day before Lottie Cole was to be deposed to explain their absence. The long delay in producing these records followed by their sudden disclosure combined with the fact that these were records at the center of appellants' case against Hopkins is sufficient

evidence to survive a motion for judgment and submit this issue to the jury. That Ms. Cowalt testified to the contrary does not alter our conclusion since the evidence is to be viewed in the light most favorable to appellants. The credibility of the witnesses and the weight of the evidence are for the jury. *Thodos,* 75 Md.App. at 713–14, 542 A.2d 1307.

■ Finally, appellee contends that the medical records claim is barred by the statute of limitations. Since there is no statute of limitations specified in Health–General § 4–302, the general three year statute of limitation applies. Md.Cts. & Jud.Proc.Code Ann. § 5–101 (1989). Appellee asserts that Mr. Davis knew that medical records were not going to be produced in October 1983 when, upon his request for production, he and his attorney were told that the 1980–82 records were missing. The court rejected this contention in denying appellee's motion for summary judgment on the medical records claim and did not address the statute of limitations issue in granting appellee's motion for judgment at the close of appellants' case.

Under Cts. & Jud.Proc. § 5–101, an action must be filed within three years of the date that it "accrues." The question of when a cause of action accrues is left to judicial determination. *Booth Glass Co. v. Huntingfield Corp.,* 304 Md. 615, 619, 500 A.2d 641 (1985) *citing Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 664, 464 A.2d 1020 (1983); *Harig v. Johns–Manville,* 284 Md. 70, 75, 394 A.2d 299 (1978).

The test to be utilized in fixing the accrual date of a cause of action calls for a determination of the time the action became vested and enforceable, *Vincent v. Palmer,* 179 Md. 365, 19 A.2d 183 (1941), *i.e.,* when the plaintiff could have maintained his action to a successful result. *James v. Weisheit,* 279 Md. 41, 367 A.2d 482 (1977); *W., B. & A. Elec. R.R. Co. v. Moss,* 130 Md. 198, 100 A. 86 (1917).

*Goldstein v. Potomac Elec. Power Co.*, 285 Md. 673, 684, 404 A.2d 1064 (1979). Further, the discovery rule is applicable generally to all actions and the cause of action accrues when the claimant in fact knew or should have known of the wrong. *Poffenberger v. Risser*, 290 Md. 631, 636, 431 A.2d 677 (1981).

For appellants to have a "vested and enforceable" claim, under Health–General § 4–302, they must wait for passage of a reasonable amount of time. Thus, the statute of limitations would not begin to run in October 1983 at Mr. Davis' initial notice that the medical records were missing.

The general rule seems also settled in the computation of the statutory period, in cases where there is an undertaking which requires a continuation of services, or the party's right depends upon the happening of an event in the future, the statute begins to run only from the time the services can be completed or from the time the event happens.

*Waldman v. Rohrbaugh*, 241 Md. 137, 141–2, 215 A.2d 825 (1966) *quoting Moss*, 130 Md. at 204–5, 100 A. 86.

Appellants filed their medical records claim as part of their Amended Complaint in May 1988. The statute of limitations then would extend back to May 1985. Given the size of Hopkins' facilities, the total number of pages of records maintained, the number of pages of records requested, the fact that the initial request was oral and not written, and that many requested records were produced by Hopkins, even if we were to consider appellee's inability to produce Bobby's medical records upon request in October 1983 a refusal, we do not believe that a delay of nineteen months to be so inherently unreasonable under the circumstances as to charge appellants with knowledge of a vested and enforceable claim for violation of Health–General § 4–302. It was not until 1986 that appellant made a formal written request for these records in claimants' First Request for Production of Documents. Although a response was due in March 1986, appellee did not respond until September 1986 that it would produce the records. In

fact, appellee did not produce the records at that time. It was at this point that appellants should have known that appellee was in violation of Health–General § 4–302. The May 1988 filing was within the three year statute of limitations.

THE JUDGMENT OF THE COURT AS TO ISSUES ONE, TWO AND THREE AFFIRMED; THE JUDGMENT AS TO ISSUE FOUR REVERSED AND REMANDED FOR TRIAL. COSTS TO BE PAID ONE–HALF BY APPELLANTS AND ONE–HALF BY APPELLEES.