LUMBER TERMINALS, INCORPORATED *v.* EDWARD
ALPHONSE NOWAKOWSKI ET AL.

[No. 874, September Term, 1976.]

*Decided May 13, 1977.*

The cause was argued before MENCHINE, DAVIDSON and LOWE, JJ.

*Donald L. Merriman,* with whom were *Merriman, Crowther & Mann* on the brief, for appellant.

*Eugene V. Chircus,* with whom were *Fred Ginsberg* and *Brice G. Dowell* on the brief, for appellees.

LOWE, J., delivered the opinion of the Court.

Chagrined by nearly every ruling made during its negligence trial in the Superior Court of Baltimore City, appellant Lumber Terminals, Incorporated brings us 5 issues with 17 subsidiary questions which it argues are errors sufficient to warrant reversal of the $365,000 judgment against it. Some of these issues relate to the sufficiency of the evidence, and we shall dispose of them summarily by reference to the facts cast in the light most favorable to appellees. Viewed thus, the evidence is sufficient to justify the finding that appellant was negligent, and insufficient for us to conclude that appellant's assignments of error with regard to liability and

instructions to the jury have merit. We base our prerogative in so reviewing these contentions upon the standard for determining a directed verdict, the denial of which is the procedural conveyance for appellant's appeal on the sufficiency issues:

> "Negligence is a relative term and must be decided upon the facts of each particular case. Ordinarily it is a question of fact to be determined by the jury, and before it can be determined as a matter of law that one has not been guilty of negligence, the truth of all the credible evidence tending to sustain the claim of negligence must be assumed and all favorable inferences of fact fairly deducible therefrom tending to establish negligence drawn. *Kantor v. Ash*, 215 Md. 285. Cf. *Suman v. Hoffman*, 221 Md. 302. And Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury. The rule has been stated as requiring submission if there be any evidence, however slight, *legally sufficient* as tending to prove negligence, and the weight and value of such evidence will be left to the jury. *Ford v. Bradford*, 213 Md. 534. Cf. *Bernardi v. Roedel*, 225 Md. 17, 21." *Fowler v. Smith*, 240 Md. 240, 246.

## LIABILITY

Edward Alphonse Nowakowski was a stevedore employed as a "slinger" on a pier, helping to unload lumber from a vessel adjacently berthed. The lumber, bound in bundles, was hoisted out of the ship by a crane from which hung cables parted by an attached spreader. The cables were looped and rehooked to form a double sling. The bundles were deposited upon chocks on the ground. The cables were then slackened so Nowakowski and his partner could slide them from under the bundles. The workers would then walk to the opposite side of the lumber and the crane operator would return his slings for another load. A stilt-like

conveyance called a "ross carrier", reminiscent of a long-legged beetle, would then come forward, hover over the lumber, pick it up with blades attached to its undercarriage, and carry it to a storage area located a block away on the pier.

The accident occurred when the cables slackened and about 20 pieces of lumber fell from a bundle. When this happened Nowakowski and partner, following the usual procedure, unhooked each of the cables on the spreader to permit the operator to pull the cables free from the fallen lumber. When free, Nowakowski and partner returned from opposite sides of the draft whence they had repaired awaiting the cable withdrawal, and when the operator relowered the hook, replaced the cables. Nowakowski then walked between the lumber and the waiting carrier to repile the fallen pieces without which the carrier could not have picked up the bundles. This broken bundle procedure occurred about three times a day, and, as was customary, no signals were given to the carrier operator (who was perched high above the carrier) not to approach the bundle. This was presumably not necessary because, as the operator testified, he could see everything around the area where the men were working when he returned from the storage area. Within 30 feet of the bundles he could see everything clearly, and his vision in the area remained clear; but, within 20 feet, his vision to the right became obscured.

In spite of that blocked view, on this occasion the operator had stopped his carrier only 20 feet away from the lumber piles where he sat for a couple of minutes. Then, while Nowakowski was bent over the lumber picking up the fallen pieces, the operator moved the carrier forward. Nowakowski, who was unaware of its forward movement, continued his efforts until the carrier was above him, and his right foot was crushed as the carrier's wheel first ran over it, then backed over it again.

We find that evidence sufficient to justify a jury's finding of negligence on the part of the carrier's operator.

## Contributory Negligence and Assumption of Risk

Our review of the record fails to disclose evidence sufficient to have compelled a finding of contributory negligence or assumption of risk as a matter of law, and no evidence sufficient to require an instruction thereon, although the trial judge did instruct the jury on contributory negligence. We see nothing in the testimony to indicate that Nowakowski was, as a matter of law, guilty of contributory negligence or its counterpart, assumption of risk. *Clayborne v. Mueller*, 266 Md. 30, 38. Nowakowski was not compelled to anticipate negligent acts by others, and in the absence of some prominent and decisive act contributing to the accident which could leave no room for a difference of opinion, appellant was not entitled to a directed verdict as a matter of law. *Clayborne v. Mueller, supra,* 266 Md. at 35-36; see *Menish v. Polinger Company,* 277 Md. 553, 563.

Nor do we find sufficient evidence that Nowakowski voluntarily exposed himself to any danger that was not ordinarily manifest in his job from day to day. One cannot assume a danger of which he is unaware. See *Menish v. Polinger Company, supra,* 277 Md. at 561. The evidence, taken most favorably to Nowakowski, shows that he was not aware, and had no reason to be aware, of the approaching danger.

## Adequacy of Instructions

Appellant's contentions relative to inadequate instructions are equally without merit. There is no responsibility upon a trial judge to marshall the facts from either parties' view although he may sum up the evidence if he chooses. Md. Rule 554.b. Nor is there evidence in this case of any special duties or standards of care beyond those generally applicable in negligence cases, as instructed by the judge below. The judge need not negate every inapplicable theory, and should not when there is no supportive evidence to justify negative instructions (*e.g.,* inapplicability of "rules of the road"); and he need not expound precisely that language requested if the appropriate and applicable law is

fairly covered in his charge. Md. Rule 554.b.1. We find that to have been true in this case. There was no error in instructing on the liability aspects of the case.

## Disability

Concluding the sufficiency issues, we note our disagreement with appellant that there was insufficient evidence in the record from which the jury could have concluded that Nowakowski was permanently and totally disabled. Since two doctors testified that they did not believe Nowakowski would ever return to work as a stevedore, and a rehabilitation officer testified that Nowakowski was not sufficiently endowed with attributes to be retrained, considering his age and medical limitations, we are not certain upon what appellant's contention is based. The testimony was relevant and could properly be considered by the jury in assessing the extent of the alleged disability. *Richard F. Kline, Inc. v. Grosh,* 245 Md. 236. We are of the opinion that there was sufficient evidence of the permanence of Nowakowski's injuries and of their extent to warrant their submission to the jury. See *Ihrie v. Anthony,* 205 Md. 296; *Byrum v. Maryott,* 26 Md. App. 130.

## DAMAGES

Appellant raises more novel questions in the area of damages. Some of them,[1] relating to the testimony of an

---

1. Appellant has interwoven numerous challenges to the sufficiency of the economist's factual foundation with the three substantial legal issues to be reached. With regard to them, it will suffice to say that we have carefully considered them but, in light of our review of the record, we are persuaded by the reasoning of appellees, their factual summarizations, and their legal authority in response to appellant's subissues c, d, e, f, g and j of question III. To discuss our deliberations upon those issues would unduly encumber an already too cumbersome opinion. Expressly we find that:

  c. The economist's testimony was based upon contracts properly admitted into evidence and testimony relating these contracts to appellee. A detailed interpretation of all the provisions in the contracts, by an expert or otherwise, was plainly not necessary.

  d. The economist's computations with regard to hours Nowakowski worked over the past two years included holiday pay. There is no error

**economist, pose issues heretofore unsettled, or at least unarticulated in Maryland.**

in considering what an employee actually receives in addition to the hours actually worked.

e. The economist was not bound by the minimum hours of work guaranteed by contract, but properly used and explained that he used an average of hours actually worked, including hours for which Nowakowski received holiday pay.

f. The economist was justified in assuming that the last two years Nowakowski worked were not extraordinary years, and that they contained an average loss of time for reduction by reason of weather, strikes and seasonal influences. There was no error in using computations based on hours actually worked.

g. It was not improper to project future wage losses on past experience of the economy (see subsequent issues) as applied to Nowakowski when the supporting bases of the projections are before the jury. Cf. State Roads Comm'n v. Parker, 275 Md. 651, 652; Marshall v. Sellers, 188 Md. 508, 519. Likewise, there was no error in assuming that Nowakowski would have continued to work as a stevedore.

j. It was not improper for the economist to project future lost income upon trends taken from past contracts when the foundation of the conjecture is before the jury. The economist explained that foundation for the jury's consideration:

"MR. MERRIMAN: Now, Your Honor, I would interrupt the doctor at this point to make a special objection. Although no question has been asked, obviously this testimony is geared to a contract which would have expired and the doctor is now projecting this in the future as a certainty. Excuse me, Doctor.

THE WITNESS: Your Honor, may I comment on that?

THE COURT: Yes.

THE WITNESS: Over the last of the contracts in the past, there has been a gradual uptrend in the ratio of employer contributions to fringe benefits per dollar wages paid. For example, in 1971-'72, the fringe benefit contributions by the employer were $1.42 an hour on a wage of five fifteen. That's not quite as large a fraction as $2.84 on a wage of $8.00.

So, that the calculation I am using here assumes that the increase which has been observed in the past in fringe benefits per dollar wages will stop at the end of the contract in 1977.

So, in that sense, this thirty-two per cent is conservative as compared with the projection that would calculate a continuing increase in fringe benefits per dollar wages. I did not project a continuation of the past increase in fringe benefits per dollar wages. I predicted that the per dollar wages would stop increasing at the expiration of the contract in 1977.

THE COURT: I understand. Well, is it legitimate to calculate that as a part of his loss of earnings, the loss of the employer's contributions to the fringe benefits.

THE WITNESS: In my opinion, it is, because a person who works until normal retirement under a union contract, which has benefits attached, receives a retirement pensions which are based on the contract he has made during his working life;

Appellant contends it was error to permit the economist to testify because:

(1) "his values would ... not be reduced to 'present value' ";

(2) "his figures would include estimates ... and projections for inflation, wage increases, price increases and other speculative and inflammatory factors";

(3) "his calculations were made on the basis of gross rather than net wages claimed lost to the date of trial despite the fact that appropriate tax deductions to net wages were easily ascertainable".

## Reduction to Present Value

In personal injury cases courts generally, and Maryland particularly, consider among other losses, lost wages and earnings suffered by the injured person not only from the time of injury to the trial, but those reasonably certain to occur in the future. *Brooks v. Fairman,* 253 Md. 471. For purposes of judicial simplicity, these awards are generally computed to a bottom line lump sum award. *Scott v. James Gibbons Co.,* 192 Md. 319, 331.

As a result of this practice, over half century ago the

> whereas, those contributions made by the employer are not part of take home pay. They are put into a fund which is administered for the benefit of employees, and when a person stops working before normal retirement, the value of his pension is less."

As to recovery for fringe benefits, see Plank v. Summers, 203 Md. 552, 562, where the Court expressly considered a serviceman's hospital benefits as part of his compensation, saying:

> "If, by their services, the appellants paid for the medical and hospital expenses, certainly the value of these are proper items for the jury to consider in arriving at the amount of damages to be paid by the appellee."

It follows, from this and our following discussion of damages, that the trial judge's refusal to grant appellant's motion in limine regarding damages was not error.

Supreme Court in reviewing a death claim under the Federal Employees Liability Act stated:

> "That where future payments are to be anticipated and capitalized in a verdict the plaintiff is entitled to no more than their present worth, is commonly recognized in the state courts." *Ches. & Ohio Ry. Co. v. Kelly*, 241 U. S. 485, 493.

The Court reasoned that:

> "So far as a verdict is based upon the deprivation of future benefits, it will afford more than compensation if it be made up by aggregating the benefits without taking account of the earning power of the money that is presently to be awarded. It is self-evident that a given sum of money in hand is worth more than the like sum of money payable in the future." *Id.* at 489.

Maryland has recognized this principle in matters of breach of contract at least since the turn of the century, *Sherley v. Sherley*, 118 Md. 1, 26-27; and has recently proclaimed that failure to so instruct a jury — in a wrongful death case — is reversible error. *Walston v. Sun Cab Co.*, 267 Md. 559, affirming this Court's opinion delivered by Judge Powers in *Sun Cab Co. v. Walston*, 115 Md. App. 113.[2]

But in personal injury cases we have not yet been blessed with the *Walston* lack of equivocation. What little light has been shed on the issue in such cases was provided by *Hutzell v. Boyer*, 252 Md. 227, which held that:

> " . . . we do not think the lower court's refusal to grant such an instruction, if error at all, was prejudicial error." *Id.* at 237.

Ironically the Court, which four years later said that "this Court has not ruled on the issue of present value in wrongful death cases",[3] may have previously labored under the

---

2. Judge Powers traced the assimilation of the concept of reduction to present value into the Court of Appeals' case law, but Judge Barnes' proclamation provided the indicia of finality. 267 Md. at 573 and 575.

3. Walston, *supra*, 267 Md. at 573.

misapprehension that it had, for it had said in *Hutzell v. Boyer, supra:*

> "However, reduction of damages to present value is not customary in Maryland, except in cases of wrongful death, as is evident from the decision of this Court in *Adams v. Benson*, 208 Md. 261 (1955)." [4] *Hutzell v. Boyer, supra*, 252 Md. at 237-238.

Fully recognizing the *Hutzell* holding, appellant attacks its foundation by alleging that *Adams v. Benson* "does not at all stand for the proposition alleged". Without quibbling over what the proposition was for which *Adams* was cited, it is perfectly clear that whatever its dicta meant, the *holding* of *Hutzell* was that it is not prejudicial error to refuse a requested instruction that the projected earning capacity of an impaired person should be reduced to present value. It obviously follows that testimony of present value is not *required* as a condition upon which an economist may project future wage loss.

The distinction made between wrongful death and personal injury cases (requiring an instruction in the former but not the latter, that, "as a matter of law" the jury must reduce the pecuniary benefit, which the wife and children of the deceased might reasonably have expected to receive from him if he had not been killed, to its present value, *Walston, supra*, 267 Md. at 571) can not be logically based upon the restricted damages allowed in wrongful death cases, and has no sound basis in principle. The "pecuniary loss rule" in force at the time of the wrongful death in *Walston, supra*, (1967) [5] limited the equitable plaintiffs to the value of their

---

4. This irony was explained by Judge Powers in Sun Cab Co. v. Walston, *supra*, 15 Md. App. at 124:

> "Strangely, the principle seems to have crept into the law by common acceptance, for the Court of Appeals has never had occasion to rule squarely upon it."

5. Laws 1962, ch. 36, § 43, codified as Md. Code, Art. 67, § 4. The current version of the wrongful death statute, Md. Code, Cts. Art., § 3-904, as amended insofar as relevant here by Laws 1969, Ch. 352, no longer provides that the pecuniary loss rule is the sole limit of damages in a suit for the wrongful death of a spouse or minor child.

*pecuniary* interest in the life of the person killed. This included only pecuniary losses already sustained by them and which they may suffer in the future as a result of the death. See generally *Jennings v. United States,* 178 F. Supp. 516. Future earnings, without regard to what the plaintiffs would have received from the deceased, were not recoverable, *Smith v. Potomac Ed. Co.,* 165 F. Supp. 681; see *Reisterstown Tnpk. v. State,* 71 Md. 573, 582-583; and no award was permitted for grief or sufferings of the relations of the deceased, *Balto. Trans. Co. v. Castranda,* 194 Md. 421, 436, or for grief and mental suffering of the deceased before his death, *State v. Wooleyhan Transport Co.,* 192 Md. 686, 693.

Seldom has the rule been invoked as to an injured person, even if he is permanently injured; however, it is difficult to justify the distinction but for its more difficult application in personal injury cases. As indicated above, the injured party is entitled to prospective wages lost by reason of the accident, see *Adams v. Benson, supra,* and damages for less discernible intangibles, such as pain and suffering. *Gent v. Cole,* 38 Md. 110, 114-115; *Stockton v. Frey,* 4 Gill 406, 420. In short, the measure of damages, broadly stated, is the amount which will compensate an injured person for all losses he has sustained by reason of the injury. See *Rhone v. Fisher,* 224 Md. 223, 225; *B. & O. R. R. Co. v. Blocher,* 27 Md. 277. This description comprehends for jury consideration such evasive factors as the claimant's state of health before and after the injury, the permanency of the injury and the degree of disability in relation to his pursuits. See, *e.g., McMahon v. N.C.R.R. Co.,* 39 Md. 438; *Bannon v. B. & O. R.R. Co.,* 24 Md. 108.

We hasten to add, however, that evidence of the present value of future lost earnings is not improper *per se,* and when offered, may be a valid consideration by the jury. It may come in directly through a defendant's expert or upon cross-examination of a plaintiff's expert; and indeed may even be introduced by a plaintiff bending every effort at fair play.

While the likelihood of the latter is perhaps not great, we mention it because it arose in that manner in the case at bar. The expert testified from a placard of figures prepared for the trial. On the side exposed to the jury were projections of wage loss which included an inflationary factor. On the back, available but never exposed either directly or through questions by the defendant, were the same projections reduced to present value. Appellees' counsel explained that his reluctance to offer these rested upon the equivocal state of the law as he read it in *Hutzell, supra.*[6] His reluctance was as understandable as his anticipatory preparation was commendable. Appellant can hardly complain that the reduced figures were not before the jury. They were there for the asking.

## The Inflationary Factor

Appellant reversed his procedure of inquiry to us on this issue. Instead of asking whether such testimony is a prerequisite for an economist to testify as it did with present value, appellant asks if it is a permissible subject for a testifying economist. As with present value, we will restrict our response to the question asked.

In *Walston, supra,* 267 Md. at 573, speaking of present value in wrongful death cases, the Court of Appeals commented that:

"Although some courts do not reduce damages to present value in an attempt to offset inflation and

---

6. In addition to counsel's explanation to the court, the witness so testified:

"And [appellees' attorney] said to me that he feared that if I were to present my original calculation involving reduction of present value, that it's possible that the Court would overrule it, following a precedent of the preceding case. Therefore, he asked me to make a second calculation without the reduction of present value, and I said that I didn't regard this as valid from the point of view of economics, and if anyone asked me about it I would have to say that, and he said he was perfectly happy about that, but he felt that I should be prepared to do both calculations in case the Court should overrule my calculation involving reduction of present value. Then, the other one would be available to present. And, in fact, the other one is on the back of that piece of paper."

include future wage increases, *see, e.g., Beaulieu v. Elliott,* 434 P. 2d 665 (Alaska 1967); *Leavitt v. Gillaspie,* 443 P. 2d 61 (Alaska 1968) (Dictum), this approach has been criticized as being too 'speculative' for a jury's consideration. *Hampton v. State Highway Commission,* 209 Kan. 565, 498 P. 2d 236, 254 (1972) (Schroeder, J. dissenting). *See also* Am. Jur. 2d *Damages* § 96 (1965)."

Appellant contends that this passage indicates that:

"The court went on to leave no lingering doubt that Maryland would follow the majority rule requiring reduction of damages to present value and the above quote strongly suggests that the court would feel the minority viewpoint regarding inflation and/or deflation testimony to be speculative and, therefore, improper."

As already indicated, we do not agree that reduction to present value is required. We now add that neither do we believe that language indicates a direction for us by the Court of Appeals.

By applying the yardstick of past experience (used also to predict present value), we must by now recognize that continued future inflation is regretably more probable than speculative. That being so, we can hardly question the relevance of the dollar's prospective purchasing power, *vis a vis* the amount of a monetary award.

The admissibility of such testimony has only become an issue recently, and already several states have held it admissible.[7] But numerically more persuasive are those

---

7. See Alaska: Beaulieu v. Elliott, 434 P. 2d 665 (1967); Florida: Seaboard Coast Line R. R. Company v. Garrison, 336 So. 2d 423 (1976); Indiana: Richmond Gas Corporation v. Reeves, 302 N.E.2d 795 (1973); Iowa: Schnebly v. Baker, 217 N.W.2d 708 (1974); Montana: Resner v. Northern Pacific Railway, 505 P. 2d 86 (1973); New Jersey: Tenore v. Nu Car Carriers, Inc., 341 A. 2d 613 (1975); Oregon: Plourd v. Southern Pacific Transportation Co., 513 P. 2d 1140 (1973). See also United States v. English, 521 F. 2d 63 (9th Cir. 1975); Feldman v. Allegheny Airlines, Inc., 524 F. 2d 384 (2nd Cir. 1975) (interpreting Connecticut law); Weakley v. Fishbach & Moore, Inc., 515 F. 2d 1260 (5th Cir. 1975) (interpreting Texas law); Bach v. Penn Central Transportation Co., 502 F. 2d 1117 (6th Cir. 1974).

states which have sidled up to the issue without meeting it head-on. Approximately half the states have sustained awards attacked as excessive, partially but expressly upon the recognition of increased living costs, 12 A.L.R.2d 611, § 8; and several others have taken judicial notice of the diminished dollar value. 12 A.L.R.2d 611, § 13. By no means do we say that the majority of states' courts would, if directly confronted, permit expert testimony of inflationary factors for jury consideration. That remains to be decided. However, there does appear, especially in this decade, a trend recognizing that an award of damages, regardless of its size, has meaning only in regard to what it will purchase. See, e.g., *Seaboard Coast Line R. R. Company v. Garrison*, 336 So. 2d 423. Moreover, a number of the cases which appear to reject consideration of inflationary factors have actually based their decisions on the quality of proof rather than an intrinsically speculative nature of the factor. See, e.g., *Hoffman v. Sterling Drug, Inc.*, 485 F. 2d 132; *Magill v. Westinghouse Electric Corporation*, 464 F. 2d 294.

In light of the current national obsession with economic indicators, we are simply permitting a jury of citizens who daily read predictions of inflation to have before them one whose qualifications must be approved by the court, to provide not only his predictions, but the foundation upon which they are based. This permits the court to control the quality of information upon which the jury may determine damages. To preclude that testimony would be to ignore the common and popular media-spread knowledge of the economy, which in turn gives far greater opportunity and less foundation for jury speculation than does providing control on the quality of what may be considered on that subject.

If, on the contrary, we were to preclude this controlled expert testimony of inflation, it would necessarily follow that a defendant would be entitled to an instruction that there can be no consideration of the past or future purchasing power of the dollar. Such an ostrich-like position proclaims that the dollar will remain as sound in the future

as it may now be, and that possibility is far more speculative than basing our forecast on past experience. In balance, such a result would be more dangerous to the plaintiff than permitting expert testimony of future probabilities would be to a defendant.

It seems preferable, however, that consideration of inflationary factors and present value should be considered together. While they may indeed be offsetting in their mutual exclusion, see *Sleeman v. Chesapeake and Ohio Railway Company*, 414 F. 2d 305, they are consubstantial counterparts, and each may be weighed simultaneously as a counterbalance on the same scale.

### Taxes

Appellant also attacks the economist's testimony because "his calculations were made on the basis of gross rather than net wages to the date of trial despite the fact that appropriate tax deductions to net wages were easily discernible." By restricting this contention to lost wages *prior* to trial, appellant seemingly concedes by silence that future wage loss should not be subject to tax. We are aware of no Maryland case which treats the tax question as to either accrued or prospective loss of earnings.[8]

The more general view, supported directly or inferentially by a decided majority of cases, is that in fixing damages for loss of past earnings or for impairment of future earning

---

8. Although Culley v. Pennsylvania Railroad Company, 244 F. Supp. 710, 715, interpreting Maryland Law, held that:

> "Damages which are based upon earnings must be awarded without consideration of the impact of income taxes.",

it relied upon Rhone v. Fisher, 224 Md. 223, 225 because that case purported to set forth "the standard instruction" in Maryland; but as summarized there, no mention was made of taxes. We can hardly accept Culley's reasoning as sufficient authority. We are, however, more impressed with Judge Thomsen's discussion of whether taxes should be considered in Plant v. Simmons Company, 321 F. Supp. 735, 739. He relied on another federal case, Jennings v. United States, 178 F. Supp. 516, to conclude that taxes should not be considered in assessing damages under Maryland law. Jennings did hold that taxes should not be considered, *id.* at 532, but did so without citation to any Maryland authority.

capacity because of personal injuries, the income tax consequences of the injury and award should not be taken into consideration. 63 A.L.R.2d 1393, § 4; see also *Cincota v. United States*, 362 F. Supp. 386, 407-408 (D. C. Md. 1973). We think that Maryland should be in accord with the majority view. Without distinguishing whether accrued or prospective, the award of damages should be based upon the plaintiff's gross earnings or earning capacity and should not be reduced because of any income tax savings which may result to the plaintiff from the fact that the damages will be exempt from income tax.

Based upon appellant's argument as to the availability of information about tax consequence, it seems to have concluded that the only persuasive reason for exclusion of tax consequences was that given by some courts, *i.e.*, that the amount of one's future income tax liability is too conjectural or speculative a factor. See, *e.g.*, *Mc Weaney v. New York, N. H. & H. R. Ry. Co.*, 282 F. 2d 34, 38-39; *Stokes v. United States*, 144 F. 2d 82, 87. And we agree that future tax liability is conjectural to a large extent; however, far more persuasive to us is the fact that the matter is extraneous to the issues being tried.[9] Taxes are strictly between plaintiff as taxpayer and the government as collector, and are of no legitimate concern of the defendants. See, *e.g. Atlantic Coast Line Railroad Company v. Brown*, 92 S.E.2d 874. Although many defendants contend that because such recoveries are not taxable, a windfall is thus provided injured plaintiffs, that argument has a reverse effect. If an award were decreased by estimated taxes, the windfall would be one for the defendant, who has far less claim to it

---

9. By discussing some of the reasons for excluding considerations of tax we should not be interpreted as disregarding others, such as:

1. the collateral source rule to the effect that compensation from a collateral source will not serve to lessen damages received from the person causing the injury, Huddell v. Levin, 395 F. Supp. 64, 88;

2. the undue complications for juries to resolve, *Id.* at 87;

3. that to mitigate the damages by reason of tax exemption would nullify the Congressional intent to give the injured party the benefit of tax-free income. *Id.* at 87.

than the wage earner. The tax exemption was intended by Congress to benefit the injured party, not the wrongdoer. See *Huddell v. Levin*, 395 F. Supp. 64, 84-91; *Hall v. Chicago & North Western Railway Company*, 125 N.E.2d 77.

We find no error in permitting the economist to base his computations on gross wages.

*Judgment affirmed.*
*Costs to be paid by appellant.*