622 A.2d 128

**James Robert DAVIS, III et al.**

v.

**JOHNS HOPKINS HOSPITAL.**

No. 43, Sept. Term, 1991.

Court of Appeals of Maryland.

April 2, 1993.

Angus R. Everton (Robert C. Morgan, Mason, Ketterman, & Morgan, Baltimore, all on brief), for petitioners/cross respondents.

Joseph G. Finnerty, Jr. (Jonathan D. Smith, Tracey Gann Turner, Piper & Marbury, Paul M. Rosenberg, Vice President and Gen. Counsel, A. Thomas Pedroni, Jr., Managing Atty., The Johns Hopkins Health System Corp., all on brief), Baltimore, for respondent/cross-petitioner.

Jerome G. Geraghty, Andrew Radding, Francine R. Strauss, Blades & Rosenfeld, PA, Baltimore, for amicus curiae The Maryland Hosp. Ass'n, Inc.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW and KARWACKI, JJ., and CHARLES E. ORTH, Jr., Judge of the Court of Appeals of Maryland (retired, specially assigned).

McAULIFFE, Judge.

For almost all of his young life, James Robert Davis, III (Bobby), has been seriously afflicted with status epilepticus and status asthmaticus. During the early morning hours of 2 March 1983, when he was three years of age, Bobby suffered unremitting seizures, compounded by asthma. Consistent with procedures earlier established for the treatment of Bobby's medical problems, his parents called the Anne Arundel County Fire Department, who in turn summoned a Maryland State Police medevac helicopter. Bobby

was transported from his home to a nearby landing site by ambulance, and from the landing site to Johns Hopkins Hospital (Hopkins) in Baltimore by helicopter. He was treated in the Pediatric Intensive Care Unit (PICU) of Hopkins, where his seizures were broken and a fever of more than 106 degrees was reduced to normal. Unfortunately, because of oxygen deprivation which occurred at some point during the morning's events, Bobby suffered serious and permanent brain damage.

Bobby and his parents claim that Bobby's brain damage resulted from a five to ten minute delay in transporting him to the hospital—a delay they say was due to the hospital's initial refusal to accept Bobby as a patient that morning. The hospital admits that its PICU personnel initially refused to accept Bobby when the ambulance paramedics called them by radio-telephone patch to advise that Bobby was about to be transferred to a helicopter for transport to Hopkins. Hopkins explains, however, that because the personnel of its PICU were operating at maximum capacity and could not handle another patient, the unit had been placed on "fly-by" status the day before, meaning that the unit was closed to the admission of any additional patients. The hospital states that Bobby was ultimately accepted that morning only because of the insistence of rescue personnel and Bobby's father that Bobby be transferred to Hopkins instead of to Children's Hospital, the available alternate tertiary care facility. Any delay, Hopkins says, was necessitated by the requirement that the resident on duty contact the supervisor authorized to modify the fly-by status, and by the need to conduct an emergency reappraisal of assets and patient demands to see if Bobby could somehow be accommodated. The plaintiffs respond that the previous course of their dealings with the hospital, and certain letters issued by the hospital, created both a contract and a tort duty to accept Bobby at any time the need arose and without delay—that as to Bobby there could be no closed or fly-by status. A more detailed recitation of the underlying facts will be required to sharpen the focus on these issues

and to explain plaintiffs' subsequent claim that the hospital refused to provide requested medical records. First, however, we briefly recite the relevant procedural history of the case.

Bobby and his parents filed a malpractice claim against the hospital with the Health Claims Arbitration Office. *See* Maryland Code (1974, 1989 Repl.Vol.) § 3–2A–04 of the Courts and Judicial Proceedings Article. The Arbitration Panel ruled in favor of the hospital. The plaintiffs filed a notice of rejection of the award and a complaint for negligence in the Circuit Court for Baltimore City. Four months later, the plaintiffs filed an amended complaint adding claims of breach of contract, abandonment, malicious interference with medical treatment, and refusal to provide requested medical records. Prior to trial, the lower court granted the hospital's motion for summary judgment on the malicious interference count, and that claim is not before us. Following a trial on the liability issues, the judge granted the hospital's motions for judgment on all remaining counts. The Court of Special Appeals reversed the judgment on the count charging refusal to provide medical records, and otherwise affirmed the trial court. *Davis v. Johns Hopkins Hosp.*, 86 Md.App. 134, 585 A.2d 841 (1991). We granted the petitions of each party for certiorari.

## I.

Bobby Davis was diagnosed at age eight months as suffering from status epilepticus, a complex seizure disorder causing life-threatening, prolonged epileptic seizures during which breathing is difficult.[1] Bobby and his family live in Anne Arundel County, and the protocol of the Emergency Medical Service (EMS) Division of the Anne

---

[1]. Bobby also was diagnosed as suffering from status asthmaticus and cerebral palsy. An evaluation performed by the Kennedy Institute when Bobby was two-and-one-half years old revealed that he was mildly to moderately mentally retarded, probably as a result of numerous and prolonged periods of oxygen deprivation during his seizures.

Arundel County Fire Department required that in the event of an emergency, Bobby would be transported to the nearest hospital, which was North Arundel County Hospital (North Arundel). After attempts were made to stabilize Bobby at North Arundel, he was to be transported to Hopkins for further treatment.

On one occasion, while receiving treatment for a seizure, Bobby went into respiratory arrest at North Arundel. On another occasion, treatment was delayed because a staff member at North Arundel was unfamiliar with one of Bobby's medications. Concerned that Bobby's condition was too complex for the North Arundel staff, Mr. Davis sought to have Bobby transported directly to Hopkins for treatment of future seizures. In order to deviate from its protocol, Anne Arundel fire and rescue officials required a letter from Hopkins stating that it was medically acceptable to transport Bobby directly to Hopkins. Upon Mr. Davis's request, Hopkins issued such a letter, signed by Dr. John Freemen, Director of Pediatric Neurology and by Dr. Schlomo Shinnar, a pediatric neurologist who treated and followed Bobby. The 9 February 1981 letter to Chief Roger Simonds of the EMS Division stated:

I am writing to you concerning special transportation arrangements for James Davis. James is a one year old child with a complex seizure disorder who is followed by us at the Pediatric Neurology clinic at Johns Hopkins. He is currently on multiple medications including phenobarbital, clonazepam and valproate. When James goes into status epilepticus, which he does frequently with high fevers, he is difficult to manage. In the past he has required transfer to the Johns Hopkins Pediatric Intensive Care Unit or the Pediatric Neurology ward each time. Initial management at the outlying hospital was at times delayed secondary to lack of familiarity with James' complex seizure disorder. I feel that in view of these problems it would be better to transport James directly to the Johns Hopkins Pediatric Emergency Room with advance warning by radio to the ER and pediatric neurolo-

gy. There are always risks in transporting a seizing child, but I feel that they are in this case justified. These risks have been explained to James' parents who understand and support this decision. I will be glad to provide more details on request.

Upon receipt of this letter, Chief Simonds issued orders to the ambulance crews to transport Bobby directly to Hopkins in the event of an emergency, rather than stopping first at a local hospital.

Another letter, or rather the first in a series of "To Whom it May Concern" letters, was also provided by Hopkins at this time. These letters, updated periodically, contained information about Bobby's medications and the management of his condition, so that Bobby could be treated by medical personnel unfamiliar with his case should he be unable to be transported to Hopkins for any reason. Such a letter was successfully used to treat Bobby at the Medical College of Virginia Hospital, where Bobby was taken when he seized during a visit to King's Dominion. Bobby's parents carried copies of these letters and presented them to ambulance personnel whenever Bobby was transported. These letters were pinned or otherwise attached to Bobby's clothing so that the information would be readily available to hospital personnel wherever Bobby was taken.

After issuance of the 9 February 1981 letter, on each occasion that Bobby suffered a seizure in Anne Arundel County, he was transported directly to Hopkins. Initially, transportation was by ambulance, but after July of 1982, pursuant to a decision by the EMS Division, Bobby was transported by helicopter, weather permitting. Helicopter transportation was provided through the Maryland Institute for Emergency Medical Services Systems (MIEMSS), which coordinates communication regarding and transport of emergency patients throughout Maryland and Washington, D.C. When taken by ambulance, Bobby would arrive at the Pediatric Emergency Room, as contemplated by the authors of the letter. When taken by helicopter, he would be met

on the roof-top helipad by personnel from the PICU and admitted directly to the unit.[2]

At approximately 4:30 a.m. on 2 March 1983, three-year-old Bobby began seizing. Paramedics arrived at the Davis home at 4:43 a.m. They inserted a plastic device in Bobby's mouth to depress his tongue and maintain an airway. They then began to ventilate Bobby, that is, to assist his breathing by forcing oxygen into his lungs through the use of a pediatric ambu bag. Paramedics continued this treatment throughout the time Bobby was in the ambulance. The ambulance carrying Bobby and his father arrived at a designated helicopter landing site in Millersville, just prior to, or at about the same time the State Police medevac helicopter arrived.

Paramedic Calvin Cavey, who was driving the ambulance, initiated radio contact with SYSCOM, the communications arm of MIEMSS, at 5:01 a.m., and requested a telephone patch to Hopkins to inform the hospital that Bobby would be brought by helicopter. The call was answered on the "red phone" in Hopkins' PICU.[3] It is unclear whether a nurse in PICU first answered the phone and then gave the call to Dr. Christopher Morrow, or whether Dr. Morrow answered the call. In any event, Paramedic Cavey spoke to Dr. Morrow, a pediatric resident, who stated that the PICU

---

**2.** Hopkins' Pediatric Emergency Room, which is accessible by ambulance, was not a part of MIEMSS. Children transported to Hopkins by helicopter are treated in the PICU for medical emergencies and in the Adult Emergency Room for trauma cases.

**3.** The SYSCOM operator who handled the call testified that in accordance with standard operating procedure he initially patched the call through to the PICU and to the Adult Emergency Room at Hopkins. He explained that the Adult Emergency Room at Hopkins handled pediatric trauma patients, and that because it was not always clear at the time of the initial call whether the patient had a medical or a trauma problem, the patch was made to both and it was up to the appropriate facility at the hospital to handle the call as soon as the nature of the problem was made known. Neither Paramedic Cavey, nor Dr. Morrow to whom he spoke at Hopkins' PICU, suggested that anyone from the Adult Emergency Room was in fact involved in the conversation.

would not admit Bobby because it was on fly-by status, during which new patients are not accepted due to staff and/or facilities shortages.[4] In accordance with MIEMSS procedure, Dr. Morrow informed Cavey that Bobby should be taken to the nearest hospital or to Children's Hospital in Washington, D.C., a comparable tertiary care facility that was only six minutes farther by helicopter and whose PICU was available to new admissions.

Paramedic Cavey and Bobby's father insisted that Bobby be taken to Hopkins. Bobby's father gave Cavey a copy of the 9 February 1981 Hopkins' letter, which Cavey read to Dr. Morrow. Dr. Morrow explained that as a resident, he had no authority to grant an exception to the fly-by status. Dr. Morrow testified that his immediate supervisor, Dr. Elias, overheard the phone conversation, and that he and Dr. Elias conferred briefly about the possibility of creating a place for Bobby. They agreed that Dr. Setzer, a supervisor of Hopkins' PICU who had the authority to suspend fly-by status, should be called, and that was done. Dr. Setzer, when awakened at her home across the street from the hospital and advised of the situation, initially reaffirmed the directive that Bobby should be taken to Children's Hospital. When this information was communicated to the ambulance personnel and they persisted in their demand that Bobby be brought to Hopkins, Dr. Setzer said, "tell them to come on, I guess; I don't know what else to do; there's refusal to go to Children's Hospital." Dr. Setzer estimated that the total elapsed time for that conversation was four to five minutes.

Dr. Setzer then spoke to the charge nurse and reviewed with her the status of the 11 children who were patients in PICU to determine which one of them could be moved out

---

**4.** The PICU went on fly-by status at 8:00 p.m. the previous evening because the unit was operating at full capacity. Through MIEMSS, inpatient facilities which are unable to accommodate more patients refer emergencies to other facilities in the system who are available to provide treatment. In this case, Hopkins' PICU had ascertained that Children's Hospital's PICU was available before placing itself on fly-by status.

of the unit with the least risk, and whether bed space and personnel were available out of the unit to take care of the transferred child. When that decision was made, and the necessary orders were written by the attending resident in PICU, the selected child was disconnected from her monitor and moved by a PICU nurse to another section of the hospital.[5] Dr. Setzer then dressed and came to the PICU, where she assisted in the emergency care of Bobby.

The helicopter, which had arrived over the landing site in Millersville at 5:03 a.m., departed with Bobby at 5:14 a.m., and arrived at Hopkins at 5:27 a.m. Bobby traveled in the helicopter lying face down on the lap of Trooper First Class Deal. Bobby was not ventilated with an ambu bag while in the helicopter. Rather, Trooper Deal kept the plastic airway device in place and applied an oxygen face mask, occasionally removing it to wipe away draining secretions. Trooper Deal testified that he could not have operated an ambu bag in the helicopter because he needed one hand to restrain Bobby and the other to try to keep the oxygen mask on him.[6] Moreover, he stated, Bobby was breathing and heaving so rapidly that it would have been impossible to hold him and match his rate of respiration by pumping an ambu bag.

When Bobby arrived at Hopkins, he was still suffering unremitting seizures, and had a temperature somewhat in excess of 106 degrees. He was also suffering from severe oxygen deprivation. Initial blood gas tests showed that he had three times the normal carbon dioxide in his blood, and

---

5. The child who was transferred to accommodate Bobby was a three and one-half-month-old infant who had been transferred to Hopkins PICU earlier that day. She suffered from bloody diarrhea, severe dehydration, and air in her intestines. She weighed only 10 pounds, having lost about 10 to 15 percent of her weight in the days immediately prior to her admission. She survived.

6. The helicopter was manned by two State troopers. Trooper McMahon flew the helicopter and Mr. Davis was seated in front with him. Accordingly, Trooper Deal had no one to assist him in the patient-care area of the helicopter.

his pH had dropped to an acidic level. The oxygen deprivation problem was handled promptly when Bobby responded rapidly to ventilation provided by the respiratory therapist, but it took approximately 45 minutes to bring the seizure under control by the intravenous injection of extraordinary doses of valium and phenobarbital.

The parties agree that Bobby suffered permanent brain damage in the course of his seizures that night. They are in agreement that Bobby was afforded proper care when he reached Hopkins, and that he was adequately ventilated while there. They disagree as to the precise cause of Bobby's brain damage. Plaintiffs argue that if it had not been for the 5–10 minute delay occasioned by the initial refusal of Hopkins, the damage would not have occurred. Hopkins suggests that the damage resulted from the failure to adequately ventilate Bobby during the 13 minutes he was in the helicopter. In the view we take of this case, it will not be necessary for us to reach the question of causation.

## II.

### *Negligence*

■ In addressing the plaintiffs' argument that the trial judge improperly took the negligence counts from the jury, we begin by noting that a motion for judgment must be denied if any evidence has been introduced which could support a finding in favor of the non-moving party. *See e.g., Beahm v. Shortall,* 279 Md. 321, 342–43, 368 A.2d 1005 (1977); *Lumber Terminals v. Nowakowski,* 36 Md.App. 82, 84, 373 A.2d 282 (1977). If an element of the cause of action is lacking as a matter of law, however, the matter should not be submitted to the jury. *See Fowler v. Smith,* 240 Md. 240, 246–47, 213 A.2d 549 (1965).

■ The plaintiffs' primary contention before this Court is that the trial court erred in characterizing the question of Hopkins' duty as a question of law rather than as a factual issue. In short, the plaintiffs argue that Hopkins' legal duty is a duty to provide care within certain medical stan-

dards and, therefore, that the existence of a duty is determined by the medical standard of care about which their experts testified. In support of this argument, the plaintiffs cite *Shilkret v. Annapolis Emergency Hosp.*, 276 Md. 187, 202, 349 A.2d 245 (1975), in which this Court stated that

> a hospital is required to use that degree of care and skill which is expected of a reasonably competent hospital in the same or similar circumstances. As in cases brought against physicians, advances in the profession, availability of special facilities and specialists, together with all other relevant considerations, are to be taken into account.

What we said in *Jacques v. First Nat'l Bank*, 307 Md. 527, 533–34, 515 A.2d 756 (1986), about the concept of duty is applicable here:

> The duty with which we are here concerned is a duty imposed by law as a matter of sound policy, for the violation of which a person may be held to respond in damages in tort. This duty is conveniently, if not lyrically, referred to as a 'tort duty.' A tort duty does not always coexist with a moral duty. (Citation omitted.)

We discussed in *Shilkret, supra*, 276 Md. at 202, 349 A.2d 245, the question of duty as it applies to hospitals. We said:

> [A] hospital is required to use that degree of care and skill which is expected of a reasonably competent hospital in the same or similar circumstances. As in cases brought against physicians, advances in the profession, availability of special facilities and specialists, together with all relevant considerations, are to be taken into account.

Nearly 50 years ago, this Court observed that:

> A private hospital is not under a common law duty to serve everyone who applies for treatment.... In the absence of statute, it may accept some applicants and reject others.

*Levin v. Sinai Hosp. of Balto.*, 186 Md. 174, 180, 46 A.2d 298 (1946). More recently, in a somewhat similar vein, we noted that "a proprietor [of a place of public accommodation] may exclude patrons for any reason except race, color, creed, and national origin." *Silbert v. Ramsey*, 301 Md. 96, 104, 482 A.2d 147 (1984). *See also Jacques, supra*, 307 Md. at 539, 515 A.2d 756.

Professor Karen Rothenberg, in her article *Who Cares?: The Evolution of the Legal Duty To Provide Emergency Care*, 26 Hous.L.Rev. 21, 25 (1989), states the earlier prevailing rule.

During the nineteenth century, neither the hospital nor the physician had a duty to help those in need of emergency care, even if the help was readily available. Although injury, mental anguish, pain and death might result, the traditional common law provided no remedy; at least, that was the perception.

Tort theory embraced the distinction between nonfeasance and misfeasance. Essentially, the no-duty rule provides that no tort liability is imposed for nonfeasance, or failing to aid one in peril. Liability attaches only when one is guilty of misfeasance, or active misconduct that injures another. There exist several narrow classes of exceptions to this rule, but none is traditionally applied to hospitals. (Footnotes omitted.)

A number of courts have created exceptions to the earlier rule of non-liability in those instances where a patient in need of emergency care has been refused available care by a hospital customarily rendering emergency care service. *See, e.g., Wilmington General Hospital v. Manlove*, 54 Del. 15, 174 A.2d 135, 140 (1961) (duty exists to furnish care to one obviously demanding immediate attention if patient has relied upon a well-established custom of the hospital to render aid in such cases); *Valdez v. Lyman–Roberts Hosp., Inc.*, 638 S.W.2d 111, 114 n. 1 (Tex.App.1982) (following *Manlove); Stanturf v. Sipes*, 447 S.W.2d 558, 561 (Mo.1969) (delay in treatment actionable where patient who sought and was refused treatment for frostbite relied upon estab-

lished policy of hospital under which patient qualified for admission); *Richard v. Adair Hospital Foundation Corp.*, 566 S.W.2d 791, 793 (Ky.App.1978) (recognizing duty to afford treatment in emergency cases); *Mercy Med. Ctr. of Oshkosh, Inc. v. Winnebago County*, 58 Wis.2d 260, 206 N.W.2d 198, 200 (1973) (private hospitals with emergency facilities must treat persons in need of medical emergency aid even if patient cannot assure payment for the service); *Guerrero v. Copper Queen Hosp.*, 112 Ariz. 104, 537 P.2d 1329, 1331 (1975) (duty to provide emergency care arises from state statutes and regulations imposing public duty on licensed hospitals to provide emergency service, without regard to patients' ability to pay). *See also* Powers, *Hospital Emergency Service and The Open Door*, 66 Mich. L.Rev. 1455 (1968); Annotation, *Liability of Hospital for Refusal to Admit or Treat Patient*, 35 A.L.R.3d 841 (1971).

A number of states have addressed by statute the problem of emergency room services and the "dumping" of patients. *See* Rothenberg, *supra*, 26 Hous.L.Rev. 53–57. Currently, there is a federal statute applicable to all hospitals participating in the Medicare program that requires treatment of emergency medical conditions. The Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, adopted 7 April 1986 as a part of the Comprehensive Budget Reconciliation Act of 1986 (COBRA), requires that participating hospitals provide appropriate medical screening examinations within the capability of the hospital's emergency department and provide necessary stabilizing treatment for patients with emergency medical conditions, or in some cases make an appropriate transfer to another facility. *See* Annotation, *Construction and Application of Emergency Medical Treatment and Active Labor Act (42 U.S.C.S. § 1395dd)*, 104 A.L.R.Fed. 166 (1991). The federal statute was not in effect at the time of the incident involved in this case, and in any event, it would appear not to have been applicable because Bobby was not refused treatment after "coming to" an emergency room.

*See Johnson v. University of Chicago Hospitals,* 982 F.2d 230 (7th Cir.1992).

At the heart of the plaintiffs' complaint is the allegation that Hopkins owed a duty to Bobby and his parents to accept Bobby in the Hopkins' PICU without delay whenever Bobby suffered an emergency, without regard to the status of the PICU or the needs of other patients within that unit. In their complaint filed with the Health Claims Arbitration Board, and in the negligence count of their complaint filed in the circuit court, the plaintiffs alleged:

> That as a result of the delay occasioned by the negligence of Johns Hopkins Hospital and its agents, servants, and/or employees *in failing to make an exception to the "fly-by" status for James Robert Davis, III,* he suffered severe brain damage. (Emphasis added.)

This argument was summarized by plaintiffs' counsel during consideration of the defendant's motion for judgment, when he asserted that: "[F]ly-by never applied to Bobby."

Two expert witnesses testified on behalf of the plaintiffs that when Hopkins was advised Bobby was suffering a medical emergency of this type, the hospital should have accepted him immediately, notwithstanding the fly-by status of the PICU. Neither expert challenged the protocol established by Hopkins to determine when the PICU should be closed to emergency patients, nor opined that a hospital could or should not establish such a procedure. Neither expert testified that Hopkins had been negligent in the conduct of its assessment of assets and needs that led to the decision, or in making the decision to close the unit when it did.

The testimony concerning the protocol for closing the unit and the factors to be considered by Hopkins in making the decision in this case was uncontradicted. Dr. Mark Rogers, who was Director of Hopkins' PICU in March of 1983, and Dr. Setzer, the pediatric fellow supervising the operation of Hopkins' PICU at that time, testified concerning the procedure followed to close the unit to elective surgery patients

and to place it on fly-by status. They explained that the availability of qualified personnel, the needs of existing patients, and the number of spaces reserved for intensive care following elective surgery were constantly monitored. When the combination of those factors demonstrated that the unit would soon be at maximum capacity, elective surgeries would be cancelled or not booked as required to reserve some capacity to accept emergency patients. The PICU was then considered "closed" but was not on fly-by status. When, notwithstanding these measures, the PICU actually reached a critical point when it was concluded that no new patients, emergency or otherwise, could be accepted, the director, fellows, residents, and nurses would re-check their assets and needs. If no possible accommodation for additional patients could be found, contact would be made with SYSCOM to ensure that a comparable facility in the system would be available. If, as in this case, a comparable facility was available, SYSCOM was notified that Hopkins' PICU was being placed on fly-by status. The SYSCOM operator would then notify any helicopter or ambulance personnel calling in with a pediatric patient that Hopkins was on fly-by, and would refer the calling unit to the nearest available appropriate facility.

The charge nurse and/or the resident who spoke to the ambulance attendant in this case advised him of the fly-by status, in accordance with hospital and SYSCOM protocol. Moreover, the ambulance attendant was advised of the availability of a comparable tertiary care facility within the system.

The evidence is insufficient as a matter of law to establish a duty on the part of Hopkins to accept Bobby in the PICU when that unit was closed to emergency admissions in accordance with a protocol that has not been challenged. The plaintiffs insist that Bobby was an exception; that the prior dealings he had had with Hopkins' PICU and the letter of 9 February 1981 written by Hopkins, guaranteed Bobby admission under any circumstances. We do not see it that way. There is nothing in the letter written to Chief Si-

monds that commits Hopkins to accept Bobby under any and every contingency. The history of the letter, well known to Bobby's parents, was that Hopkins agreed with the parents that Bobby was not being best served by an initial stop at a local hospital for stabilization, and Hopkins wrote the letter to permit the Anne Arundel County authorities to vary from their established protocol.

The plaintiffs suggest that Bobby's claim falls within the reach of § 323 of the *Restatement (Second) of Torts* (1965). That section provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

The plaintiffs contend that the earlier course of conduct involving multiple admissions and treatment at Hopkins' PICU, and the letter Hopkins wrote, demonstrate an undertaking to treat Bobby whenever he required treatment. Bobby suffered harm, they say, because there was a delay caused by the plaintiffs' reasonable reliance upon that undertaking.

While we may agree that the earlier conduct of the hospital in this case was sufficient to support a reasonable reliance on the part of the plaintiffs that Hopkins' PICU would continue to accept and treat Bobby whenever that unit was able to do so, and that Hopkins may therefore have been liable for damage caused by an arbitrary or unwarranted refusal to accept Bobby, there simply is no evidence of that type of conduct in this case.

Surely no emergency treatment has eve[r] been denied solely because of the legal right of the hospital to refuse

treatment. It is to be expected, on the other hand, that treatment might be refused if the case is nonemergent or if the emergency facilities are full.

Powers, *supra,* 66 Mich.L.Rev. at 1459–60. *See also Costa v. Regents of Univ. of Calif.,* 116 Cal.App.2d 445, 254 P.2d 85, 95 (1953). Judge Bishop, writing for the Court of Special Appeals, put it succinctly, when he said:

[A] hospital is under no duty to accept a person with an emergency condition when there are no facilities available to treat the person properly. A hospital cannot be placed in the position where the admission of an additional patient will jeopardize the care of its existing patients.

*Davis v. Johns Hopkins Hosp., supra,* 86 Md.App. at 149, 585 A.2d 841.

Plaintiffs argue in the alternative that even if Hopkins correctly refused Bobby admission to the PICU, it should have immediately accepted him for treatment elsewhere in the hospital. Perhaps because this theory was not the principal focus of the plaintiffs' case, it was never developed with any degree of precision. Plaintiffs simply say that Hopkins somehow should have taken Bobby. They suggest that perhaps some of the PICU personnel could have met Bobby at the helipad and given him treatment elsewhere, even if there was not a bed then available in PICU. This theory overlooks the uncontroverted fact that the PICU was closed because personnel were not available to take care of anyone other than those children already in the unit. Nor is the fact that Hopkins' PICU ultimately did take Bobby dispositive. That someone in the hospital, after consultation with the person having authority to make exceptions to protocol, might be able to take extraordinary measures to accommodate a patient demanding admission does not mean that the hospital is negligent in following sound protocol by initially denying that admission.

Plaintiffs also suggest that Bobby might have been treated at the Pediatric Emergency Room of Hopkins. The evidence indicates that when Bobby had been brought by ambulance to Hopkins on prior occasions, he was often

admitted through the Pediatric Emergency Room. The evidence does not disclose, however, any procedure in place for the receipt of Pediatric Emergency Room patients by helicopter. Indeed, the evidence is that in the early morning hours there ordinarily would be only one nurse and one physician on duty in the Pediatric Emergency Room. Presumably, if Bobby were to be treated in the Pediatric Emergency Room after arrival by helicopter, someone would have to make arrangements for a gurney to be taken to the helipad and Bobby would then be transported by elevator to the basement of one building, through a passageway to another accompanying building, and up an elevator to the Pediatric Emergency Room. Although there was evidence that subsequent to the incident involved in this case a procedure was developed to accept a patient in that manner, there was no evidence that such a procedure had ever been followed before.

■ Moreover, the request that was being made to Hopkins was not for admission to the Pediatric Emergency Room, but for admission to the PICU, and the response to that request was not negligent. Nor do we believe that under these circumstances the personnel answering the red phone in the PICU had a duty to suggest a possible referral to the Pediatric Emergency Room, when there was no indication that such an admission had ever been made in that manner or that procedures were in place to accomplish it, and where established protocol required referral to the nearest available tertiary care facility, specifically, the PICU of Children's Hospital.

## III.

### Abandonment and Breach of Contract

■ Plaintiffs' petition for certiorari did not raise any questions concerning the action of the Court of Special Appeals affirming the entry of judgment for Hopkins on the abandonment and breach of contract counts. In accordance with Maryland Rule 8–131(b)(1), those issues are not

before us. Had those issues been before us, we would have affirmed the action of the intermediate appellate court as to them. For reasons stated earlier, we conclude that there was no evidence of a contract between Hopkins and the plaintiffs for immediate treatment of Bobby under any and all circumstances. Moreover, it appears that this question was not preserved for review in the Court of Special Appeals. *Davis v. Johns Hopkins Hosp., supra,* 86 Md.App. at 152–53, 585 A.2d 841. On the issue of abandonment, the evidence does not disclose the existence of a physician-patient relationship which would ordinarily bring into play principles of abandonment, and in any event, a referral under circumstances here present would not constitute an abandonment.

## IV.

### Refusal to Provide Medical Records

■ In their amended complaint, plaintiffs claimed compensatory and punitive damages for the hospital's alleged violation of § 4–302 of the Health General Article, Maryland Code (1982). They contend that the hospital delayed the production of essential medical records for an unreasonable period of time. At that time, §§ 4–302(b)(1) and 4–302(d)(2) provided, respectively:

Except as otherwise provided in this subsection, a facility shall comply within a reasonable time after a person in interest requests, in writing:

(i) To receive a copy of a medical record; or

(ii) To see and copy the medical record.

\* \* \* \* \* \*

If a facility refuses to disclose a medical record within a reasonable time after a person in interest requests the disclosure, the facility is, in addition to any liability for actual damages, liable for punitive damages.

The record discloses that on 12 January 1983, nearly two months before the seizure giving rise to this action, a doctor treating Bobby during another admission noted in Bobby's

records that some volumes containing records of earlier admissions were missing. In October of 1983, Bobby's father and his attorney were informed that the volumes containing records of admissions from late 1980 through 1982 could not be found. All other records, including those of the 2 March 1983 admission, were produced in accordance with a request made at that time.

In February of 1986, during the pendency of the arbitration proceeding, the plaintiffs requested that Hopkins disclose all of Bobby's records. Although a response was due in March, there was none until September of 1986 when Hopkins stated that the records would be produced. Lisa Kowal, a senior claims coordinator for Hopkins, testified as part of the plaintiffs' case that she and other personnel from the medical records section searched periodically for the missing volumes. In April of 1987, the volumes containing records of 1981 admissions were located, and copies of those records were sent to plaintiffs' counsel.

In August of 1989, while Hopkins' medical records department underwent a prolonged reorganization, the plaintiffs requested a deposition of the custodian of records regarding the still-missing records. Three days before the scheduled deposition, Ms. Kowal met with the custodian; a call was made to the medical records department, and 45 minutes later the missing volumes were found. The records of 1982 admissions were made available to both parties shortly thereafter, less than one month before trial.

The trial judge granted the hospital's motion for judgment on the medical records count, noting the absence of any direct evidence of an intent to withhold available records. The Court of Special Appeals reversed, holding that sufficient evidence had been presented from which a jury could reasonably infer that the nonproduction had been intentional. *Davis, supra,* 86 Md.App. at 154–55, 585 A.2d 841.

In *Laubach v. Franklin Square Hosp.,* 79 Md.App. 203, 218, 556 A.2d 682 (1989), the Court of Special Appeals

held that "[b]y its express terms, [§ 4–302] proscribes intentional, as opposed to negligent or contractual, conduct." We affirmed the judgment in that case, but in so doing we were not required to pass on that point. *Franklin Square Hosp. v. Laubach*, 318 Md. 615, 569 A.2d 693 (1990). We now make clear that we agree with the Court of Special Appeals that § 4–302 addressed an intentional withholding of medical records.[7]

In light of our holding that a mere failure to produce records does not constitute a violation of § 4–302, the critical question is whether the plaintiffs presented enough evidence of an intent on the part of Hopkins not to produce the records to survive a motion for judgment. Hopkins correctly notes that the plaintiffs, who relied primarily upon testimony by Ms. Kowal in attempting to establish the violation, did not put forth any direct evidence of such an intent. The trial court ruled that the plaintiffs had not generated a jury question on this issue. The court stated:

[Plaintiffs] have not established any evidence whatsoever ... that that was done in any sense intentionally and the facts belie that since the facts show that the records were produced eventually at a time when they were found, number one. Number two, a search was made and a diligent search ... and number three and probably most importantly, that the record itself is evidence that a search was made for lost records much prior to the incident itself....

The plaintiffs maintain, however, that there was sufficient evidence to support a reasonable inference of intentional withholding of the records and that the jury should have been permitted to decide whether the inference was warranted. The Court of Special Appeals agreed with this reasoning, holding:

7. The current version of the statute, § 4–309(a) of the Health–General Article, Maryland Code (1982, 1990 Repl.Vol., 1992 Cum.Supp.), provides for sanctions when a health care provider "knowingly refuses to disclose a medical record within a reasonable time...."

The long delay in producing these records followed by their sudden disclosure combined with the fact that these were records at the center of appellants' case against Hopkins is sufficient evidence to survive a motion for judgment and submit this issue to the jury.

*Davis, supra,* 86 Md.App. at 154–55, 585 A.2d 841.

Hopkins contends that the fact that the delay was "long" and the disclosure "sudden" cannot support an inference of intentional non-production or else nearly all failures could support a finding of a refusal. More important, Hopkins argues that the court's premise that the records were "at the center of [the plaintiffs] case" is simply inaccurate. The hospital notes that no expert relied on the once-missing records, and there was no other evidence to support the assumption that they were important to the case, particularly since the records of the 3 March 1983 admission were promptly produced when the litigation began.

The plaintiffs, on the other hand, maintain that Hopkins' defense is premised on the truth of the assertion that hospital personnel continuously searched for the records during the time they were missing. They argue that it was inappropriate to enter judgment simply because they could not directly disprove the hospital's assertion, contending that as in cases of fraud and deceit, which are rarely proved or provable by direct evidence, "circumstantial evidence can be used to establish a refusal to produce records in violation of § 4–302." Particularly since the trial judge was obligated to view the evidence in the light most favorable to the non-moving party, Maryland Rule 2–519(b), the plaintiffs contend that the Court of Special Appeals must be affirmed.

Similar arguments were made in *Laubach,* in which the defendant hospital, like Hopkins, argued that the plaintiffs' lack of direct evidence of intent precluded jury consideration of the claim. In that case, however, the hospital's argument was that the fetal heart monitor tracings which were not produced were not "medical records" within the meaning of the statute and that even if they were subsequently held to be medical records, the hospital could not

have intended to withhold material that at the time it reasonably did not think had been requested. The *Laubach* court approved the trial court's ruling that in view of that defense, the plaintiffs' evidence of specific requests for the tracings sufficiently countered the hospital's argument to justify submitting the issue to the jury. 79 Md.App. at 222–24, 556 A.2d 682.

In this case, on the other hand, Hopkins has not claimed any misunderstanding with respect to the records sought; in fact, the hospital stated from the outset that some of the volumes requested by the plaintiffs could not be produced. Hopkins' defense is that the non-produced records were lost during that time, and the hospital's own records predating the incident giving rise to this action support that contention. Unlike the plaintiffs in *Laubach*, the plaintiffs offered no evidence contradicting the hospital's position.

We are persuaded that no reasonable jury could have concluded that the hospital intentionally withheld available records, particularly in light of the uncontested evidence that the records were lost even before the admission at issue in this suit, and the absence of evidence to suggest that the records were of any importance to the claim. We therefore agree with the trial court that the plaintiffs' evidence of intent on the part of Hopkins was inadequate to entitle them to a jury determination of whether the statute was violated.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS, JAMES ROBERT DAVIS, III et al.

ELDRIDGE, J., concurs in the result.